DUANE AND RACHELLE WARD, PRO SE

UNITED STATES DISTRICT COURT

FILED IN THE U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

EASTERN DISTRICT OF WASINGTON

APR 18 2019

SEAN F. McAVOY, CLERK
_____, DEPUTY
RICHLAND, WASHINGTON

| | |
|---|---|
| DUANE WARD, an individual; and RACHELLE WARD, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF BENTON, an entity; CHILD PROTECTION SERVICES CHILD WELFARE SERVICES CHILDREN'S ADMINISTRATION COUNTY OF KING, an entity; CHILD PROTECTION SERVICES CHILD WELFARE SERVICES SEATTLE CHILDREN'S HOSPITAL CHILDREN'S PROTECTION PROGRAM Protection Program SCAN Team DEPARTMENT of CHILD. YOUTH and FAMILY, an entity; DEPARTMENT of SOCIAL and HEALTH SERVICES, an entity; ANA BROWN, individual and/or official capacity; ERIC CHOW, individual and/or official capacity; MARCO DEOCHOA, individual and/or official capacity; JENNIFER GOURLEY, individual and/or official capacity; DAMON JANSEN, individual and/or official capacity; Honorable JERRI POTTS, individual and/or official capacity; KATHY LUND, individual and/or official capacity; LESLIE SMITH, individual and/or official capacity; LAUREN TRUSCOTT, individual and/or official capacity; REBECCA WEISTER, individual and/or official capacity; DOES 1 through 100 inclusive, <br><br> Defendants, | Case No.: 4:19-CV-5014-SMJ <br><br> First amended complaint <br><br> FIRST CLAIM FOR RELIEF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. §1983) (UNREASONABLE SEIZURE/FAMILIAL ASSOCIATION) SECOND CLAIM FOR RELIEF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. §1983) (DECEPTION) THIRD CLAIM FOR RELIEF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. §1983) (MISREPRESENTATION of facts) FOURTH CLAIM FOR RELIEF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. §1983) (NOTICE AND HEARING) FIFTH CLAIM FOR RELIEF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. §1983) (INVESTIGATION AND A PREDPRIVATION HEARING) SIXTH CLAIM FOR RELIEF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. §1983) (POST DEPRIVATION JUDICIAL REVIEW TO RATIFY EMERGENCY ACTION) SEVENTH CLAIM FOR RELIEF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. §1983) (SUPRESSION) EIGHTH CLAIM FOR RELIEF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. 1985) NINTH CLAIM FOR RELIEF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. §1983 ) MONELL TENTH CLAIM FOR RELIEF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. §1983 ) MONELL |

{FIRST AMENDED COMPLAINT}    **PAGE 1**

## JURISDICTION AND VENUE

**1** Plaintiffs Duane Ward and Rachelle Ward bring this lawsuit pursuant to §42 U.S.C. §1983 and §42 U.S.C. §1985 to redress the deprivation of rights secured to them under the United States Constitution, including Fourteenth Amendment. These deprivations were inflicted by the Defendants herein, and each of them, in some manner.

**2** Jurisdiction is conferred pursuant to 28 U.S.C. §1343(a)(3) and §1343(a)(4), which provides for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1985. Jurisdiction is also conferred by 28 U.S.C. §1331 because the claims for relief derive from the United States Constitution and the laws of the United States.

**3** Because the acts and omissions complained of herein occurred in WASHINTON, and it is believed that all Defendants currently reside in the State of WASHINGTON, venue is proper in the District Court for the Eastern District of WASHINGTON.

**4** These allegations are based on Plaintiffs' personal knowledge, and on information and belief.

## PARTIES

**5** Rachelle Ward ("Rachelle" or "Rachelle Ward") and Duane Ward ("Duane" or "Duane Ward"), ("Parents") with their ("children"), C.W. and G.W., maintained a permanent residence in Benton County, WA. Rachelle and C.W. moved temporarily to King County, WA beginning March 7, 2014 and ending approximately February 19, 2015. Plaintiffs are individuals and citizens of the United States of America.

**6** At all times mentioned herein, the COUNTY OF BENTON ("BENTON COUNTY" or "COUNTY OF BENTON") was and is a public entity.

**7** At all times mentioned herein, the COUNTY OF KING ("KING COUNTY") was and is a public entity.

**8** At all times mentioned herein, the CITY OF SEATTLE ("SEATTLE") was and is a public entity.

**9** At all times mentioned herein, the CITY OF RICHLAND ("RICHLAND") was and is a public entity.

**10** At all times mentioned herein, the SEATTLE POLICE DEPARTMENT (SPD) was and a department, division or entity of CITY OF SEATTLE.

**11** At all times mentioned herein, the RICHLAND POLICE DEPARTMENT (RPD) was and a department, division or entity of CITY OF RICHLAND.

**12** The DEPARTMENT OF CHILDREN and FAMILIES SERVICES (DCFS) was a division within DSHS and Children's Administration at the time of the events described. DCFS was at the time a parent organization of CPS and CWS. The state structure may have shifted but the overall function of the

Department, division, or arm remains the same. The terms DSHS, DCYF, DCFS, CA, CPS, CWS may be used interchangeably with all alias' listed in paragraphs 9-14

**13** The DEPARTMENT OF CHILDREN, YOUTH, and FAMILIES (DCYF), an entity; CHILDREN'S ADMINISTRATION was and is a public entity; previously a part of DSHS, is now a part of DCYF which became its own cabinet level department in 2018.

**14** At all times mentioned herein, the DEPARTMENT OF SOCIAL AND HEALTH SERVICES (DSHS), was and is a State Cabinet;

**15** At all times relevant to this complaint, CHILDREN'S ADMINISTRATION (CA), is an entity; CA This entity was previously under DSHS. CA is now under DCYF.

**16** At all times relevant to this complaint, CHILD PROTECTIVE SERVICES (CPS), was and is an entity; CPS is the investigative unit under CA. Benton County CPS and King County Washington CPS are separate offices under Children's Administration.

**17** At all times relevant to this complaint, CHILD WELFARE SERIVCES (CWS), was and is a public entity; CWA is the "services" unit under CA, Social Workers may also serve as investigators. Benton County CWS and King County Washington CWS are separate offices under (CA)

**18** At all times relevant to this complaint, the term "BENTON COUNTY CPS" includes Benton County Social Workers, Supervisors and Administrators including but not limited to DEOCHOA, LUND, GOURLEY, and DOES 1-100.

**19** At all times relevant to this complaint, CHILDREN'S PROTECTION PROGRAM, ("Protection Program") was and is an entity of Seattle Children's Hospital. Among other things, the Children's Protection Program is charged with coordinating the SCAN team, and to identify and intervene in concerns of child maltreatment and interpersonal violence.

**20** Children's Protection Program SCAN team ("SCAN") was and is a entity or team of people coordinated by an entity of Seattle Children's Hospital. SCAN is charged with the detection and prevention of child abuse and neglect. Under Washington State Law RCW **26.44.056**, Hospital Administrators can place a child in protective detention or custody if there is reasonable cause of imminent danger to the child. **The SCAN team f**acilitates SCAN case conferences on serious physical abuse/neglect case and includes Seattle Children's clinicians, CPS and law enforcement. The SCAN clinical team facilitates MDT reviews on complex medical neglect cases as requested by Seattle Children's staff. The team develops, reviews and revises all Seattle Children's policies and protocols that guide the diagnostic care and management of child abuse and neglect.

**21** At all times relevant to this complaint, **SEATTLE CHILDREN**'S HOSPITAL was and is a private entity. Under Washington state law RCW 26.44.056 hospital administrators can place a child in protective detention or custody if there is reasonable cause of imminent danger to the child.

**22 At all times mentioned herein, ANA BROWN was an individual residing in King County. On information and belief,** in 2014, BROWN was an officer, agent, and/or employee of CHILDREN'S HOSPITAL, CHILDREN'S PROTECTION PROGRAM, and the ('SCAN') team. Defendant BROWN is sued herein in both her individual capacity and in her official capacity as an employee of SCH and as a SCAN child abuse investigator. Ana BROWN was a SOCIAL WORKER contracted by SEATTLE CHILDREN HOSPITAL, and working under the watch of Dr. WEISTER and the SCAN team. The SCAN

social workers' function was to investigate alleged child abuse and neglect. **The SCAN social worker** acts as the primary social worker on serious child abuse/neglect concerns taking the lead of the SCAN doctor; Provides management consultation of complicated high-risk or neglect concerns to the primary psychosocial provider; AND Provides consultation to psychosocial providers to assist in whether to report to CPS/law enforcement, or if other less-restrictive alternatives may be considered, including meetings with the multidisciplinary team (MDT);

**23** **At all times mentioned herein, ERIC CHOW, M.D. ("CHOW"), was and is an individual residing in King County. On information and belief,** at all times relevant to this complaint Dr. CHOW was and is an attending physician at SEATTLE CHILDREN's HOSPITAL. Defendant CHOW is sued herein in both his individual capacity and in his official capacity as an employee, agent, and/or officer of SCH.

**24** At all times relevant to this complaint **investigative social worker MARCO DEOCHOA ("DEOCHOA") was an individual residing, on information and belief in the County of FRANKLIN, and an officer, agent, and employee of CA;** This claim brought against public employee DEOCHOA in both his individual capacity and in his official capacity as an employee of CA;

**25**

**26** At all times relevant to this complaint supervising **social worker JENNIFER GOURLEY ("GOURLEY") was an individual residing, on information and belief in the County of BENTON, and an officer, agent, and employee of CA;** This claim brought against public employee GOURLEY in both her individual capacity and in her official capacity as an employee of CA; At all times mention herein, social worker GOURLEY was performing and/or carrying out her official duties as a CA official, employee, and/or agent, and was acting under color of state law. Defendant GOURLEY is sued herein in both her individual capacity and in her official capacity as an employee of CA. Defendant GOURLEY was, on information and belief, a Social Services Supervisor.

**27** At all times relevant to this complaint detective **DAMON JANSEN** ("Jansen") is and was an individual residing in the County of BENTON, and employed by the City of Richland Police Department. At all times mention herein, Officer Jansen was performing and/or carrying out his official duties as a RPD official, employee, and/or agent, and was acting under color of state law. This claim brought against public employee JANSEN in both his individual capacity and in his official capacity as an employee of RPD;

**28** At all times relevant to this complaint, the Honorable Jerri Potts ("Commissioner" or "Commissioner POTTS") was an individual residing in the State of Washington in both Benton and Franklin Counties, and an officer, agent, and employee of BENTON COUNTY; At all times mention herein, Commissioner POTTS was performing and/or carrying out her official duties at BENTON COUNTY JUVENILE COURT, a division of BENTON COUNTY SUPERIOR COURT, as an official, employee, and/or agent, and was acting under color of state law. This claim brought against public employee Commissioner POTTS in both her individual and official capacity as an official of BENTON COUNTY.

**29** At all times relevant to this complaint **investigative social worker KATHY LUND ("LUND") was an individual residing, on information and belief in the County of BENTON, and an officer, agent, and employee of CA;** At all times mention herein, social worker LUND was performing and/or carrying out her official duties as a CA official, employee, and/or agent, and was acting under color of state law. This claim brought against public employee LUND in both her individual capacity and in her official capacity as an employee of CA;

30  At all times relevant to this complaint detective **LESLIE SMITH ("SMITH")** is and was an individual residing in the County of KING, and employed by the City of SEATTLE Police Department. At all times mention herein, Officer SMITH was performing and/or carrying out her official duties as a SPD official, employee, and/or agent, and was acting under color of state law. This claim brought against public employee SMITH in both her individual capacity and in her official capacity as an employee of SPD;

**31  At all times relevant to this complaint detective LAUREN TRUSCOTT ("TRUSCOTT") is and was an individual residing in the County of SNOWHOMISH or KING, and employed by the City of SEATTLE Police Department. At all times mention herein, Officer TRUSCOTT was performing and/or carrying out her official duties as a SPD official, employee, and/or agent, and was acting under color of state law. This claim brought against public employee TRUSCOTT in both her individual capacity and in her official capacity as an employee of SPD;**

**32  At all times mentioned herein, REBECCA WEISTER, M.D. ("WEISTER"), was and is an individual residing in King county.  On information and belief, at all times relevant to this complaint WEISTER was and is the Medical Director of the Child Protection Program, Seattle Children's Hospital; Pediatric Attending, HCSATS; Regional Medical Consultant for Region 4 (King County), Wiester is a member of the SCAN (suspected child abuse and neglect) team and an Attending at HCSATS and consults on inpatient and outpatient cases of possible child abuse and neglect at Seattle Children's Hospital and Harborview Medical Center. Resident and community education and consultation is also a part of this responsibility. As Regional Medical Consultant for DSHS, Dr. Wiester reviews cases for social workers, prepare documents as needed, give medical advice concerning select cases and provide education and guidance to DSHS staff where medical questions arise.  At all times relevant to this complaint, WEISTER had supervisory responsibility and authority over protection program employees and SCAN.  Plaintiffs are informed and believe and on such basis, alleges that WEISTER, at all relevant times mentioned herein, had the power to promulgate and implement policies governing the conduct of social workers in relation to the CHILDREN'S PROTECTION PROGERAM, and Protection Program SCAN team's handling of investigations.  Plaintiffs are further informed and believes and on such basis, alleges that WEISTER has and had the power to investigate the conduct of Department employees and to mete out discipline upon employees who engaged in the wrongful conduct alleged herein.  WEISTER had supervisory authority over the remaining social workers as the acting Director of the Children's Protection Program.  On information and belief, and/or in the alternative, WEISTER delegated such duties to BROWN, and DOES 1-100. Defendant WEISTER is sued herein in both her individual capacity and in her official capacity as an employee, agent, and/or officer of SCH and as a SCAN child abuse consultant and investigator.  WEISTER serves as a consultant for CHILDREN'S ADMINISTRATION, throughout the State of Washington. Defendant WEISTER is sued herein in her individual capacity.  As a part of The SCAN team, WEISTER Provides phone consultation to providers on the diagnosis and safe plan of care, she provides formal consults to examine the child when there is concern for serious abuse/neglect, and she provides consultation to the community via the Statewide Child Abuse Network contract managed by Seattle Children's Protection Program.**

33  Defendants DOES 1-100 are sued as fictitious names, their true names and capacities being unknown to Plaintiff. When ascertained, Plaintiff will amend this Complaint by inserting their true names and

capacities. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and those Defendants proximately caused, are responsible for and/or legally liable for Plaintiff's damages as herein alleged. Each reference in this complaint to "Defendant," "Defendants" or a specifically named Defendant refers to and includes sued under fictitious names. On information and belief, Plaintiff makes all allegations contained in this Complaint against all Defendants including DOES 1 through 100.

34 The use of "Defendants", such allegations shall be deemed to mean all named Defendants and DOES 1 through 100, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, did or authorize such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

35 The use of "KING COUNTY COMMUNITY PROTECTION TEAM DEFENDANTS", such allegations shall be deemed to mean Defendants DSHS, SEATTLE CHILDREN'S HOSPITAL, CHILDREN'S PROTECTION PROGRAM, SCAN Team, BENTON COUNTY CPS, BENTON COUNTY CWS and DOES 1-100, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, did or authorize such acts while actively engaged in the operation, management, direction, or control of the affairs of KING COUNTY COMMUNITY PROTECTION TEAM DEFENDANTS and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

36 The use of "BENTON COUNTY COMMUNITY PROTECTION TEAM DEFENDANTS", such allegations shall be deemed to mean Defendants DSHS, SEATTLE CHILDREN'S HOSPITAL, CHILDREN'S PROTECTION PROGRAM, SCAN Team, BENTON COUNTY, BENTON COUNTY CPS, BENTON COUNTY CWS, and DOES 1-100, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, did or authorize such acts while actively engaged in the operation, management, direction, or control of the affairs of BENTON COUNTY COMMUNITY PROTECTION TEAM DEFENDANTS and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

37 Defendants were the knowing agents and/or alter egos of one another. Defendants directed, ratified, and/or approved each other's conduct and that of each other's agents or employees. Defendants agreed upon, approved or ratified each other's conduct, or otherwise conspired together to commit all of the acts and/or omissions alleged herein. The above defendants are responsible for the occurrences complained of, and conspired with, and/or aided and/or abetted each other in committing the acts complained of.

## GENERAL ALLEGATIONS

38 This suit arises from the concerted acts of numerous individuals, including Ana BROWN, Lauren TRUSCOTT, Marco DEOCHOA, and Damon JANSEN, among others who in a cover-up, maligned and nearly destroyed a mother and father's bond with their child.

{FIRST AMENDED COMPLAINT}  **PAGE 6**

**39** Duane and Rachelle met in the Midwest and have been together 24 years. Duane and Rachelle moved to Richland, WA after Duane was offered full-time employment here in Washington State in 2002.

**40** The family joined Redeemer Lutheran Church in Richland, WA, where they have been members since 2002. The church became a large part of their support network.

**41** C.W. is a resident of the State of Washington and is the minor son of Duane and Rachelle Ward.

**42** G.W. is a resident of the State of Washington and is, at this time, the adult daughter of Duane and Rachelle

**43** Their lives changed in an instant when C.W. was diagnosed with Acute Lymphoblastic Leukemia (ALL) with Philadelphia Positive subset in March of 2014.

**44** Historically, a patient with a diagnosis of with Philadelphia Positive ALL has a very dismal long-term life expectancy. As a result, C.W. enrolled in a cutting edge clinical trial study, (AALL1122), to treat children who are at high risk of death due to the Philadelphia Positive subset.

**45** To participate in the Clinical Study, Rachelle and C.W. were immediately required to temporarily move to Seattle and stay within 40 minutes of Seattle Children's Hospital, so C.W. could participate in a trial study for ALL patients with the Philadelphia Positive subset. Mother and son were in Seattle for almost 12 months. Meanwhile, C.W.'s chemotherapy treatments continued for an additional year after they returned home to Richland, WA.

**46** C.W.'s diagnosis and prognosis for the future were traumatic for the family. C.W. was frightened and uncomfortable. His biggest fear was that he was going to die. The whole family experienced grief not only after the initial diagnosis but also after finding out that he had the Philadelphia Positive Arrangement, which resulted in a level of hopelessness and despair. Being Philadelphia Positive places C.W. in a rare subset of ALL where he is one in a million for kids under the age of fourteen who are stricken with Acute Lymphoblastic Leukemia. Historically, this form of leukemia has a dismal prognosis of survivability for children.

**47** Even though they experienced extreme emotions, the family knew that they had to function on a daily basis. Since C.W. was diagnosed with a life-threatening form of Leukemia, the focus remained on keeping C.W. in the best physical condition possible so his body would be healthier when dealing with the treatment and medications. C.W.'s parents understood that it was beneficial to accept any help that was offered, but they also were determined to keep C.W. the focus of their energy and attention.

**48** C.W. remained at CHILDREN'S in King County, Washington while undergoing an intense drug treatment protocol stipulated in a clinical trial (AALL1122). C.W. was physically sick from the Leukemia for the first few months.

**49** C.W. experienced side effects caused by Induction chemotherapy treatments that caused emotional peaks and valleys and physical limitations such as moving/walking very slowly, difficulty with balance and picking up his feet, pain in his joints, and pain in general during this time. Additionally, C.W.'s immune system was compromised during this treatment phase; therefore, it was necessary to limit his environment to locations within 40 minutes of the hospital, and carefully monitor and limit his exposure to threats to his immune system.

**50** When C.W. was diagnosed with an acute, life-threatening illness, John Hudspeth, a family friend of the Ward family, came to Seattle and he planned to be there one or two nights. John has a background in caregiving and was asked to serve as one of C.W.'s caregivers. In the medical records, he is referred to as

{FIRST AMENDED COMPLAINT}  **PAGE 7**

the approved caregiver for C.W.  He has 55 years of caregiving experience. John's role model was his dad who raised 4 boys. John started caring for his special needs brother Robert when he was 7 years old. John was also a caregiver for his father up until the day he died from cancer.

**51** Additionally, he was a caregiver for his mother for 7 months after her stroke while caring for his special needs brother at the same time. John cared for another brother Bill who was diagnosed with Leukemia as an adult. John spent the last 30 days in the hospital with his brother Bill who died from sepsis, a complication of Leukemia. John was also a caregiver for his sister-in-law who died from complications of diabetes. John served as the caregiver for his best friend of fifty years up to the moment that he died of liver cancer.

**52** John Hudspeth, remained with C.W. and the family for several months. The days were long, and Rachelle and Duane were overwhelmed with the challenges they faced. They wanted a supportive adult in the room with C.W. at all times to monitor medical information, monitor and support treatments for adverse reactions, and support C.W.'s emotional needs.  And so Rachelle asked John to stay to help care for C.W.  John, Rachelle and Duane would often take shifts while the others got some rest in the nearby Ronald McDonald house. One day while Rachelle was away a nurse overdosed C.W. on an opioid. John questioned her about the overdose. He based his inquiry on the manner in which Caleb was behaving. The nurse's reaction was to express anger that she had been questioned.  She then fabricated a story about inappropriate behavior to cover-up that she had overdosed a child with an opioid, (Oxycodone).  Her false nurse report is what brought in the Seattle Police Department and CPS.  The cover-up, was the beginning of a downward spiral of events that resulted in C.W. being separated from his parents and left to endure cancer treatments on his own in the cancer ward of Seattle Children's Hospital. Caleb was just eleven years old at that time. The nurse impeached herself in subsequent Interviews, and her testimony did not line up with facts and testimony given by other witnesses.

### THE FALSE NURSE REPORT

**53** A false nurse report and a subsequent flawed investigation set in motion a series of events that caused violations of the 4th and 14th Amendment to Duane and Rachelle. The harm to Duane and Rachelle involved violations of Substantive and Procedural due process rights guaranteed by the Constitution of the United States.

**54** It began on June 20th, 2014 with C.W. being admitted to Seattle Children's Hospital because of a fever. C.W. was on track to be released from the hospital Monday morning. Later that day, Social Worker BROWN, informed Rachelle that she would not be allowed to take C.W. from the Hospital. BROWN made it clear to Rachelle that C.W. was not free to leave the hospital.  This was the first unreasonable seizure which was conducted by BROWN.

**55** On June 22 a custody order that was not court ordered was written by Detective TRUSCOTT. TRUSCOTT had been contacted to investigate about possible inappropriate behavior between C.W. and his caregiver. Prior to the seizure, TRUSCOTT had watched an interview of C.W that was conducted by a child abuse interview expert. In the interview, C.W. clearly expressed to the expert that nothing inappropriate had occurred. Shortly after viewing the interview, TRUSCOTT issued an order to take custody of C.W. from his parents.  TRUSCOTT did not attempt to obtain an order that was judicially reviewed and authorized before making the decision to seize C.W.

**56** That same morning, Social Worker BROWN and TRUSCOTT joined in an interview that was in progress with Rachelle. Detective Smith and Social Worker Blackwell were questioning Rachelle. Rachelle was

responding to multiple and varied questions with no legal representation. When BROWN and TRUSCOTT joined SMITH AND BLACKWELL, the interview turned into a full-scale interrogation that included statements aimed at Rachelle's competence as a mother. Rachelle replied to questions from four individuals over a period of time that exceeded several hours.

**57** It is important to look at the context of that morning. TRUSCOTT had just left an interview conducted by a child forensics expert for King County. In the interview, C.W. was steadfast that there was no inappropriate behavior. His answers to the expert were coherent and clear. TRUSCOTT then wrote a custody order to seize C.W. TRUSCOTT's investigation had just begun. TRUSCOTT made no attempt to obtain judicial authorization before seizing C.W., nor was she in possession of evidence to support a need to take emergency action. TRUSCOTT then walked in on Rachelle's interview and began making incendiary statements. One explosive statement was that she had, 'just walked out of C.W.'s interview where digital rape had been discussed'. Her comments were deliberate fabrications. In the interview with C.W., nothing was stated about digital rape. TRUSCOTT's fabricated statement was meant to shock Rachelle and the other individuals who were present. BROWN then joined with TRUSCOTT in making a number of statements that were false and misleading. BROWN and TRUSCOTT worked together to berate Rachelle as a person and a mother. BROWN closed the police interview by informing Rachelle that C.W. was in custody, and that 'decisions concerning him would no longer be hers to make.' BROWN told Rachelle that she could not say goodbye to C.W. before leaving the hospital, and that she was to pack her belongings and leave the premises under security escort.

**58** It needs to be stated that BROWN's involvement was not limited to conspiring with TRUSCOTT. She also conspired with officials working for CPS. Her false and misleading statements were placed in the First Dependency Petition which CPS used to justify their actions. BROWN also gave direct testimony at the hearings concerning the custody status of C.W. Her false and misleading statements influenced a number of officials with final decision making authority to keep C.W. in State custody for a period of time that exceeded eight months. BROWN'S false statements were then reinserted into a Second Dependency Petition by DEOCHOA. DEOCHOA rebooted BROWN's statements into a Second Petition even though they were determined baseless in the First Petition. DEOCHOA deceived and mislead the Commissioner in charge of the Second Petition. He knowingly misrepresented to the Commissioner that Brown's rebooted allegations were current, unresolved and ongoing. DEOCHOA's deceitful conduct caused the Commissioner to make several unwitting decisions. One unwitting decision was granting a court order to seize C.W., and the other was supporting the decision to keep C.W. in State custody for an excessive amount of time.

## THE FIRST DEPENDENCY PETITON

**59** Preceding the First Dependency Petition, DEOCHOA coerced Duane and Rachelle into signing a Voluntary placement agreement, (VPA). Both officials used C.W. as leverage to force Duane and Rachelle to sign the Agreement. It was made clear to them that if they did not sign, it would take much longer to get their son back. DEOCHOA were aware that Duane and Rachelle were distraught over C.W's medical condition, and they capitalized on the parent's concern. Within a few days, Rachelle revoked the VPA. Her decision was driven by the urgency to see and care for her son. Rachelle's decision to revoke the Agreement resulted in BROWN and TRUCOTT working together to keep Rachelle from making contact with her son. BROWN enacted a second Administrative Hold of C.W., which was followed by TRUSCOTT writing a second custody order. Once again, TRUSCOTT sidestepped due process by writing a custody order that was

not judicially reviewed and authorized.  For the second time, BROWN and TRUSCOTT came to an agreement in a joint activity to deprive Rachelle of her Constitutional right to care for and manage her acutely ill son.

**60** The First Dependency Petition was written and signed off by DEOCHOA.  DEOCHOA attested to the truthfulness of the Petition with his signature under penalty of perjury.  DEOCHOA deliberately omitted from the Petition information that was material to the case, and inserted a number of allegations that were false and misleading.  The Petition was based on false and misleading statements from officials such as BROWN AND TRUSCOTT.  The Petition was the basis used to obtain a Shelter Care Order.  The Petition gave no specific, articulable evidence that supported any reasonable belief that C.W. was in any type of imminent or immediate harm.  C.W. was not returned to his parent's care for a period that exceeded eight months.  The only justification given for the excessive amount of time was a single statement in the Petition.  The statement indicated that C.W. was to remain in State custody until an outcome was reached by the Prosecutor from King County.  This is not a legally sufficient reason for CPS to remove C.W. from his family unit, especially in light of C.W.'s acute medical condition.

**61** The First Dependency Petition ended with the case being dismissed and closed.  The allegations found in the Petition were determined unfounded.  With the case settled and resolved, the family was able to return home to the Tri-Cities.  In respect to the chemotherapy treatments, C.W. was in the 'Maintenance' phase of his drug treatment protocol.  This meant C.W. could be at home with his family while taking the chemotherapy medications.  Duane and Rachelle were adept and skilled at administering the drugs in accordance to the strict directives given in C.W's drug treatment protocol.

**62** There is an overriding injustice that cannot be overstated.  The State does not want to recognize that during the time C.W. was separated from his parents, he was in the fight of his life.  The State treated C.W.'s medical condition as if he was simply ill which required some additional time at a hospital.  In truth, we are referring to an eleven year old boy who is stricken with a rare and deadly illness.  Without his parents, C.W. was subjected on a daily basis to a toxic chemotherapy drug protocol that was necessary to keep him alive.  Within this context, the State was preventing C.W. from receiving the care and support of his parents.  There could not have been a more significant time for a child to have his parents by his side.  The State did not respond properly to the needs of a child who was acutely ill. The State was not willing to concede nor recognize that the familial bond that a parent provides can never be matched or replicated by the State.  Within this backdrop, the State showed deliberate indifference to the serious medical needs of a child who was in their custody.  This is not only a Constitutional violation but a violation of common sense and decency.  The State showed callous disregard for the welfare of a child who desperately needed the comfort and care that only his parents can provide.

### CONSTITUTIONAL VIOLATIONS

**63** The First Dependency Petition served as the basis for holding C.W. in State custody for eight months.  The Petition did not provide specific, articulable evidence supporting the actions taken by the State.  The decision to seize and then detain C.W. resulted in a number of Constitutional violations to Duane and Rachelle.  The rights that were violated were clearly established at the time of the unlawful actions by the State.  The Substantive and Procedural Due Process claims by Duane and Rachelle are supported by pre-existing case law and material fact.  Some of the relevant decisions from pre-existing cases include:

**64** Seizures conducted without a court order are per se unreasonable under the Fourth Amendment. Seizures are subject to just a few "specifically established and well-delineated exceptions." One exception is when a child is in imminent danger of neglect or abuse. Other than a life-threatening illness, C.W. was not in imminent danger. In respect to imminent danger, the courts have determined that the mere possibility of danger is not enough to justify removing a child from a parent without fair and adequate process. In respect to fair and adequate due process, the courts have made a number of decisions which include:

**65** Parental rights cannot be denied without the parents having the opportunity to be heard at a meaningful time and in a meaningful manner in a judicial setting. An ex parte hearing that is based on misrepresentation and omission does not qualify as notice and an opportunity for the parents to be heard. Duane and Rachelle were denied the right to be heard prior to the State's action to seize C.W. If the parents are denied pre-deprivation notice and a hearing due to emergency action, the Constitution guarantees that adequate judicial review to ratify the emergency action is promptly accorded. Duane and Rachelle did not receive prompt and adequate post-deprivation judicial review to ratify the emergency action to seize C.W. The States justification for emergency action has to be based on 'extraordinary circumstances' where the child is in imminent or immediate danger of injury or abuse. What is extraordinary is the State's decision to remove C.W. from his parent's care, (absent specific, articulable evidence), while he is fighting for his life from an acute illness. Debunking the State's need for emergency action is the direct testimony of C.W. In spite of coercive pressure from individuals who had access and control over him for months, C.W. remained steadfast. He has maintained that he was not in any type of danger, and has repeatedly asked to go home. In respect to the emergency action taken by BROWN AND TRUSCOTT, there are clearly established and well defined limitations. "Emergency action can be taken only when a child's life is in imminent danger or when there is immediate danger of severe or irreparable harm to the child, and prior judicial authorization is not immediately obtainable, may an official summarily assume custody of a child from his parents."

**66** The First Dependency Petition was compromised by two investigations that were deeply flawed. During both investigations, the gathering of facts was influenced by the          opinions of the investigators. DEOCHOA was the investigator for CPS and TRUSCOTT for the Seattle Police Department. Instead of gathering facts with no bias, both officials looked for facts that confirmed their beliefs. Both officials conducted themselves in a manner that was unprofessional and unfair. DEOCHOA wrote a Dependency Petition where he omitted, misrepresented, or distorted material fact critical to the case. DEOCHOA's unprofessional conduct was deliberate and reckless.

### TRUSCOTT

**67** In respect to an investigator driven by opinion, DETECTIVE TRUSCOTT deserves special attention. Even though TRUSCOTT was working as a Detective for the Seattle Police Department, she inserted herself into the First Dependency Petition and made herself a major force in the Second Dependency Petition. TRUSCOTT exhibited a pattern of behavior that showed reckless disregard for conduct becoming of a police officer which included deliberate indifference to the Constitutional rights of others. TRUSCOTT'S misconduct as an officer of the law is exhaustive and highly disturbing. Some of the examples of misconduct include:

    1. TUSCOTT seized C.W. with a custody order that was not Court Ordered, even though she had no evidence that C.W. was in imminent or immediate danger of harm. She deliberately sidestepped the cardinal

rule of 4th Amendment jurisprudence which is to obtain a court order from a 'fair and impartial' judge before assuming custody of a child.

2. TRUSCOTT investigated by pursuing evidence that confirmed her beliefs, and ignored evidence that did not support her preconceived opinions. During police interviews, TRUSCOTT tainted every person she interviewed by stating her opinions of how a crime had been committed. Her attempts to bully and shame those she interviewed, and her intense need to force her opinions on others stands out in each taped interview. TRUSCOTT's effort to unduly influence the interviews is extraordinary when measured by ANY standard used for police investigations. Her conduct during the interviews rises to the level of unlawful and corrupt. The force of Truscott's character in promoting her own opinions during the interview process is willful, deliberate, and indefensible.

3. TRUSCOTT conspired with BROWN to provide false and misleading information about the competence of Rachelle as a mother. TRUSCOTT and BROWN joined together to fabricate a false narrative that Rachelle threatened to kill C.W. and that she was plotting to show-up and remove C.W. from the hospital. TRUSCOTT and BROWN worked in joint activity to fabricate allegations which served as the basis for more than one unlawful seizure of C.W. This includes administrative holds and custody orders that were not court ordered. Their deceitful misrepresentations helped set in motion a series of events that caused a number of other officials to violate the Constitutional rights of C.W. and his parents.

4. TRUSCOTT conspired with C.W.'s grandmother to have indirect access to C.W. TRUSCOTT attempted to set-up a backchannel so that C.W. could be questioned on a continual and unchecked basis. First, TRUSCOTT promoted the decision with CPS to place C.W. under his grandmother's control. TRUSCOTT then directed the grandmother to uncover any inappropriate behavior that might have occurred. This resulted in a level of ongoing duress placed upon C.W. while receiving chemotherapy treatments for Leukemia. The attempt by the grandmother to coerce C.W. to talk continued for months. This concluded with the grandmother fabricating a note that she claimed C.W. wrote. The fraudulent note alleged that C.W. wanted to speak with TRUSCOTT. The note was used as the basis for setting up an interview so that TRUSCOTT would have direct access to C.W. for a second time. TRUSCOTT then conspired with BROWN in order to ensure that the interview would take place.

5. TRUSCOTT deliberately avoided interviewing a key witness to the investigation. The key witness was C.W.'s primary care nurse practitioner. TRUSCOTT knew the key witness would provide information about a medical procedure that would stop TRUSCOTT from representing the procedure as a crime. TRUSCOTT knew the information would vitiate probable cause that she was developing for an arrest. TRUSCOTT remained willfully blind even when told in three separate interviews that the nurse practitioner was the person to seek in regard to the medical procedure. TRUSCOTT's deliberate avoidance of the nurse practitioner allowed her to push forward a crime that was, in fact, a procedure that was medically approved and directed, and medically necessary. Simply stated, If TRUSCOTT had interviewed the key witness, she would have been left with no basis to advance a crime. Her determination to not interview the material witness shows the degree of corrupt intent in respect to her state of mind as an officer of the law.

6. TRUSCOTT willfully deceived a group of professionals and officials attending a SCAN TEAM meeting at the hospital. TRUSCOTT's direct involvement at the meeting resulted in actions that were far-reaching and harmful to C.W. and his family. The SCAN TEAM met on July 1st, 2014 to address possible abuse of C.W. Also present was a deputy prosecuting attorney for King County. Participating by speakerphone was the entire Staff for CPS from the Tri-Cities. Those individuals had the authority to

{FIRST AMENDED COMPLAINT}   **PAGE 12**

significantly change the lives of C.W. and his parents. They were there to identify and respond to the allegation of abuse to C.W. TRUSCOTT addressed the group. Her purpose was to convince them that a crime toward C.W. had been committed. TRUSCOTT stated that she 'had a discussion with the mother concerning digital rape of C.W.' TRUSCOTT failed to disclose that 'digital rape' was unsupported by testimony, facts, or evidence found in her investigation, and that she had fabricated the term in a police interview with Rachelle in an effort to shock her. In other words, Truscott was 'the source' for the allegation of rape. TRUSCOTT made the incendiary statement to the group while knowing there was no evidence to support her claim. TRUSCOTT wanted to shock the professionals into believing that 'digital rape' was uncovered. She knew the individuals at the meeting had final decision making authority over the agencies they represented. TRUSCOTT's comments unified the group into taking collective action. The mood in the meeting went from highly concerned to outraged and alarmed. Those listening to TRUSCOTT were blinded by the belief that an officer of the law would not make untruthful and deceiving statements. They also assumed that an officer would lead a fair and impartial investigation. Those in attendance now believed that 'digital rape' had been uncovered during the course of the investigation. TRUSCOTT showed corrupt intent in covering her tracks by writing in her detective notes that she had merely attended the meeting on July 1st. Her bombshell testimony was revealed in CPS notes documenting the meeting. In respect to her actions, what followed the meeting was an arrest warrant signed-off by the deputy prosecuting attorney, a Dependency Petition written by CPS from the Tri-Cities, direct support from SCAN TEAM members in writing the Petition, and intrusive State interference with the Ward family. TRUSCOTT's misleading and false statements were instrumental in setting off those decisive actions. The professionals and officials who listened to TRUSCOTT became the primary players whose decisions would cause significant harm to Duane, Rachelle, C.W., and John for years to come.

7. TRUSCOTT was willfully untruthful in her written affidavit for probable cause. TRUSCOTT had interviewed a second nurse whose testimony was effusive in describing the caregiving ability of John while tending to C.W. Her testimony was firsthand and her statements were fact based and lucid. The second nurse had a nursing background that spanned twenty-seven years. TRUSCOTT perjured herself by stating in the affidavit that the nurse was concerned enough about John's behavior that she felt compelled to notify her supervisor. The second nurse categorically made no such statement in the interview with TRUSCOTT. When contacted by the prosecuting attorney, the second nurse was adamant that John did nothing inappropriate, and she was extremely upset over the unfairness of the investigation. In addition, TRUSCOTT omitted from the affidavit all the affirmative statements that the second nurse had expressed about John. This meant that almost the entire interview was omitted by TRUSCOT, (the interview was taped and transcribed).

8. TRUSCOTT deliberately suppressed the tapes and transcript of a material witness whose firsthand testimony impeached and refuted the false nurse report that started the entire investigation. The interview was conducted by TRUSCOTT with a third nurse who witnessed the same events as the nurse who gave the false report. Both nurses were together at the same exact time, and the third nurse was certain that she saw no inappropriate behavior by John. Her testimony fully challenged and refuted the veracity of the false nurse report. TRUSCOTT showed corrupt intent by withholding this exculpatory evidence from the Prosecuting Attorney for King County. The Prosecuting Attorney only became aware of the interview months after the case was decided.

9. TRUSCOTT deliberately destroyed material information that would have explained why John was chosen to care for C.W. In the interview with John, TRUSCOTT was given complete detail about John's extensive caregiving background. TRUSCOTT showed corrupt intent by willfully suppressing the information

{FIRST AMENDED COMPLAINT}   **PAGE 13**

from CPS and the King County Prosecutor's office. When a formal request was made to obtain her interview notes, TRUSCOTT'S written reply was that she had shredded the notes. When asked for the notes of her partner, detective SMITH, who was present the entire interview, TRUSCOTT responded that her notes had been shredded also. Since the 3 ½ hour interview was not recorded or videoed, TRUSCOTT willfully destroyed the only documentation of the interview.

10. TRUCOTT deliberately contributed to the Second Dependency Petition without being officially notified or assigned to do so. Acting alone, TRUSCOTT became involved in the investigation process that resulted in the filing of a Second Petition by CPS. From Seattle, TRUSCOTT contacted DETECTIVE JANSEN from the Richland Police Department of the Tri-Cities. The information that TRUSCOTT provided JANSEN was then sent to DECHOA who was investigating for CPS. TRUSCOTT's contact with JANSEN provided a backchannel to influence the Second Petition much in the same manner as she had unduly influenced the First Dependency Petition. In her contacts with JANSEN, TRUSCOTT expressed how upset she was with the way the case was handled by the Senior Prosecuting Attorney for King County, and her displeasure with the outcome. TRUSCOTT did not disclose to JANSEN that the outcome of the case was based on the absence of a crime, and TRUSCOTT'S failure to conduct the investigation in a professional manner which requires fairness and impartiality. TRUSCOTT used her established backchannel with JANSEN to disseminate and promote the same misleading and false statements that were disproven in the First Petition. Adding further harm, TRUSCOTT provided and promoted information that the Prosecuting Attorney had refused to pursue in the King County case. This included statements from her detective notes, and a second interview with C.W. The second interview was set-up, facilitated, and conspired by TRUSCOTT, BROWN, and C.W.'s grandmother. The Prosecuting Attorney did not recognize the interview as material due to the conspicuous amount of coercion and deception that was involved in the attempt to justify a second interview with C.W. The conspired aim between TRUSCOTT, BROWN, and the grandmother was to allow TRUSCOTT to get another shot at C.W. Even though TRUSCOTT had been reassigned to squad car patrol following the case in Seattle, she was able to respond to JANSEN. Her response included promoting her opinions of the Seattle case, gaining access to the police file, and sending the information to JANSEN. TRUSCOTT'S determination to unduly influence the Second Dependency Petition illuminates the degree of emotional investment that she carried about the case. As significant, her backchannel effort to reinsert her influence over the State's approach toward John and the Ward family reveals a continuation of officer misconduct and corrupt intent.

## THE SECOND DEPENDENCY PETITION

**68** Approximately a year after C.W. was returned to his parents, a Second Dependency Petition was filed by CPS from the Tri-Cities. Once again, the Second Petition was written by DEOCHOA and others individuals. DEOCHOA attested to the truthfulness of the Petition with his signature under penalty of perjury. At that time C.W. was home and in the 'Maintenance Phase' of his chemotherapy drug protocol. Duane and Rachelle were administering and monitoring the chemotherapy drugs in regard to the exact scheduling and dosage dictated by his clinical trial study.

**69** DEOCHOA was the official who signed the Second Dependency Petition but it is evident there were additional writers. One such person is Dr. WEISTER. WEISTER is the director of the SCAN TEAM for Seattle Childrens Hospital, and she was deeply invested in the First Dependency Petition. Therefore, it is not surprising that WEISTER assisted with the Second Petition which resulted in the seizure of C.W. The last paragraph of the Petition is indicative of her writing style and sense of cerebral entitlement. It is

noteworthy that WEISTER has maintained a level of distain for Rachelle that is palpable. WEISTER could not reconcile that Rachelle trusted what her son was saying and her own firsthand observations rather than professional opinion. To WEISTER, this translated to Rachelle being a neglectful mother. The statements that C.W. and Rachelle provided were immaterial. Instead, WEISTER placed her trust in theory and probability. As a result, WEISTER did not meet C.W., read the witness transcripts, watch the interview videos of C.W., look at C.W.'s medical records, or talk with C.W.'s primary care nurse practitioner. WEISTER operated within the constraints of a consultant whose opinions did not need to be verified by facts. WEISTER conspired with CPS to help write, assist, and advise the First and Second Dependency Petitions which resulted in the unlawful seizure of C.W. and Constitutional harm to Duane and Rachelle.

**70** The event that triggered the Second Dependency Petition was a phone call from a workout club called Gold's Gym. The phone call was made to the Kennewick Police Department. The call as written by the police despatcher was "inappropriate horseplay in a swimming pool." At some point, the police department contacted CPS which initiated their own investigation. The investigation for CPS was led by DEOCHOA. It is important to note that there was no investigation carried forth by the police department beyond the customary practice of submitting a standard-form police report. In respect to the degree of investigating by DEOCHA, there is no indication that he visited Gold's Gym, or conducted interviews with any of their staff members. It appears that DEOCHOA relied solely on the submitted police report.

**71** DEOCHOA did interview C.W. and his parents. The interview with C.W. was unannounced at his school without his parent's awareness or consent. The Second Petition included statements DEOCHOA claimed were made by C.W during the school interview. Most of the statements that were attributed to C.W. were either not made by C.W. or were written by DEOCHOA in a misleading and distorted manner. The interview was further hampered by a notable language barrier due to DEOCHOA's accent. C.W. indicated to Duane and Rachelle that a number of questions that DEOCHOA asked were not clear enough to fully understand.

**72** The interview with Duane and Rachelle occurred on January 13th, 2016. DEOCHOA met with Rachelle and Duane at their attorney's office.   DEOCHOA arrived with Lieutenant JANSEN of the Richland Police Department.   His presence was unexpected and unannounced.   JANSEN was not serving in an official capacity since his police unit was not conducting an investigation. JANSEN expressed that he was present to support and provide backup for DEOCHOA. During the ensuing interview, JANSEN showed an unusual amount of acrimony toward Duane and Rachelle. JANSEN failed to disclose that he had been in direct contact with TRUSCOTT prior to the interview. In hindsight, it was apparent that JANSEN was restating TRUSCOTT's opinions of how poorly the case was handled in Seattle by the Senior Prosecuting Attorney for King County. Tainted and primed by TRUSCOTT's opinions, JANSEN joined with DEOCHOA in showing contempt for the decisions of the Senior Prosecuting Attorney. Their understanding of the case was clouded by TRUSCOTT's effort to provide false and misleading information to JANSEN. Channeling TRUSCOTT's opinions, DEOCHOA and JANSEN objected to the outcome of the case in Seattle, and were adamant that the case should not have been settled.   At that meeting, Duane and Rachelle presented a number of documents to DEOCHOA and JANSEN. The documents verified that the First Dependency was settled and closed, and that the allegations that TRUSCOTT pushed forward as a crime were eventually determined by the Prosecuting Attorney to be unsupported by material fact and evidence. Of equal importance, the Prosecutor also realized as the case progressed that the actions of TRUSCOTT

made the initial charge impossible to pursue in a manner that was just and fair. DEOCHOA was also handed a written Stipulation from a King County Superior Court Judge granting Caleb and John the right to work-out together with a single condition attached to the work-out sessions. The condition that adults be present was to remain in effect for one year. The purpose of the Stipulation by the judge was to authorize their right to work-out together to protect against any adverse blowback from agencies such as CPS.

**73** During the interview, DUANE AND RACHELLE expressed a number of relevant facts to DEOCHOA and JANSEN. It was expressed that the First Dependency began with a nurse giving a false nurse report in retaliation for John questioning her about overdosing C.W. with an opioid. DEOCHOA AND JANSEN were told that the alleged crime that TRUSCOTT pursued and carried forward was in fact a medical procedure. The procedure was the application of ointment to C.W. to cover open sores caused by chemotherapy drugs. They were told the procedure was medically necessary and prescribed, and that both John and Rachelle were directed by C.W.'s nurse practitioner to apply the ointment directly onto C.W. DEOCHOA and JANSEN were told that TRUSCOTT avoided interviewing the nurse practitioner so that the application of the ointment could be treated as a crime. DEOCHOA and JANSEN were told that the case was dead as soon as the Prosecuting Attorney became aware that TRUSCOTT had turned a blind eye toward the nurse practitioner who could explain the medical urgency of the ointment. DEOCHOA and JANSEN were told that when the Prosecuting Attorney had the interview with the nurse practitioner, it became clear to him that the investigation by TRUSCOTT was deeply flawed and legally indefensible.

**74** During the course of the heated interview, JANSEN disclosed to Duane and Rachelle that he was in direct contact with TRUSCOTT, and that TRUSCOTT had expressed her contempt for the decisions of the Prosecuting Attorney. JANSEN stated that TRUSCOTT felt that the Prosecuting Attorney had not done his job and that she had gathered more evidence that should have been pursued. JANSEN revealed that TRUSCOTT had been reassigned to squad car patrol, but was still able to provide her detective notes and other information about the case for the CPS investigation in the Tri-Cities.

**75** All through the interview, DEOCHOA and JANSEN worked together to denigrate Duane and Rachelle. Duane was baited with statements that mocked his masculinity and his ability to protect his family. DEOCHOA and JANSEN were especially harsh with Rachelle by making hurtful comments that she was unfit as a mother for not protecting her son. Toward the end of the interview, DEOCHOA threatened Duane and Rachelle that Dependency Action would be taken if contact between John and C.W. did not cease. In desperation to protect C.W. from being removed from his family once again, a verbal offer was made to DEOCHOA. Duane and Rachelle said they would end contact between C.W. and John. The offer was made under extreme duress and coercion. In reaction to the offer, DEOCHO told Duane and Rachelle that he would close the case and not file a Dependency Petition. DEOCHOA also voiced his official basis for objecting to the work-outs. DEOCHOIA stated that if John and C.W. continued to work-out together, CPS would receive additional calls of concern from the community, and he would be required to investigate. It is troubling that as the lead investigator that was his single objection to the workouts. This odd and unexpected statement is found in DEOCHO's affidavit justifying the need for a Second Dependency Petition and the subsequent seizure of Caleb. It's also worth noting that during the entire interview with Duane and Rachelle, DEOCHO offered no alternative CPS services or programs other than his reassurance that a Dependency Petition would not be filed.

**76** On or about January 18th, a group of CPS supervisors met in regard to the case. The decision was made to move forward with a Second Dependency Petition. It is critical to note that C.W. was seized a full twenty-five days after the workout at GOLD'S GYM. The seizure of C.W. violated a number of Substantive and Procedural due process rights that are protected by the United States Constitution. It is revealing in respect to the mindset of the officials who represent CPS of the Tri-Cities that the decision to proceed confirmed that CPS had no interest, and made no reasonable effort to keep the family unit together.

**77** The majority of the content found in the Second Dependency Petition was rebranded allegations that comprised the First Dependency Petition. The allegations pulled from the First Petition were alleged to have occurred while C.W. was receiving chemotherapy treatments at Seattle Children's Hospital in Seattle. A major point that needs to be made is that the allegations that migrated to the Second Dependency Petition had been resolved, settled, and closed In Seattle. There are two exceptions that are unrelated to the settled allegations. What makes them different is they are not found in the First Petition. Those two exceptions are The Gold's Gym incident and information that TRUSCOTT personally gave to JANSEN. The two exceptions will be explained later.

**78** The Tri-Cities Commissioner, who authorized the court order to remove C.W. from his home, made a reasonable assumption. She assumed that the allegations found in the Second Dependency Petition were relevant, ongoing, and current. The fact is they were not. CPS did not disclose to the Commissioner that most of the Second Petition was a reboot of the First Petition. The Commissioner was unaware that the allegations that resurfaced on the Second Petition had been subjected to judicial review and were determined to be unfounded. CPS kept the Commissioner off-balance by reinserting allegations that had been disproven in Seattle. Furthermore, CPS treated the settled allegations as if they were urgent and had to be addressed. Due to the deceptive action of CPS, the Commissioner operated in the dark and made a number of unwitting decisions. CPS deceived the Commissioner into treating the rebooted allegations as ongoing. The action of CPS to deceive was calculated. CPS exploited the trust of the Commissioner by presenting the rebooted allegations as exigent and imminently harmful to C.W. The Commissioner's decisions were unwitting because she did not have a grasp of the relevant facts. As a result, the decisions made by her and the actions that she approved unfairly harmed C.W. and his parents. Duane and Rachelle had to go through and endure another unreasonable seizure of their son. They had to defend themselves yet again from the same accusations of neglect that were disproven in Seattle. C.W. had to go through the trauma of being forcefully removed from his family unit for a second time. On top of all that, it cannot be forgotten that this forced separation occurred during a critical medical time period. This occurred when the parents were personally responsible for administrating the last phase of C.W.'s chemotherapy drug treatment protocol for his acute and life threatening illness.

### THE TWO EXCEPTIONS

**79** How the two exceptions fit into the Second Dependency needs to be explained. The two exceptions are noteworthy because they did not migrate from the First Petition. The exceptions are the Gold's Gym Incident and the information given by TRUSCOTT to JANSEN. What sets Gold Gym apart is the incident was current, relevant, and unsettled. The Gold's Gym work-out was the catalyst for the CPS investigation, and was the basis for the seizure of C.W. from his parents. Regardless of CPS's intent to hide this fact, the Gold's Gym work-out was the reason for filing the Second Dependency Petition. The decision by CPS to pack the Second Petition with rebooted allegations was meant to conceal the underlying

vulnerability of CPS's actions. Specifically, that the Gold's Gym workout was not a legally sufficient reason for the removal of C.W. from his family unit. CPS's effort to deceive shows their concern that the seizure of C.W. based on Gold's Gym would not holdup under judicial review.

**80** In respect to the Gold's Gym incident, all information was pulled from a Kennewick police report. The police report was a follow-up to a phone call placed from Gold's Gym to a police dispatcher. The complaint was, "inappropriate horseplay in a swimming pool". Several days later, a police officer interviewed one person at Gold's Gym. The single source was a Gold Gym's Manager. The Manager spoke for two male staff members and described incidents that he did not personally witness. Neither the police officer nor CPS interviewed the absent staff members in order to confirm the veracity of the Manager's statements. The Manager described incidents which categorically did not occur. One fabricated incident described an alleged argument between John and a male staff member over the usage of a steam room located next to the pool. The second incident alleged that the same staff member followed John and C.W. into a locker room where the staff member felt that they spent too much time in a changing room. The changing room is located in the center of the locker room. The Manager failed to disclose to the police officer that the life guard was the only staff member present in the pool area, and that she interacted with John and C.W. on the day they worked-out. She was present the entire time that John and C.W. were in the pool area. In respect to a motive for giving a false police report to a police officer, The Manager disclosed, in a subsequent phone call that the police report provided him the basis for terminating John's membership with Gold's Gym without recourse. He also added that the truthfulness of the report "made no difference to him".

**81** The second exception concerns the information that TRUSCOTT provided to JANSEN. This effort by TRUSCOTT was independent of her official duties or assignments in Seattle. Once again, TRUSCOTT established a backchannel to give information that would unduly influence an investigation. This time it was the investigation conducted in the Tri-Cities. The information from TRUSCOTT went to JANSEN who passed it to DEOCHOA. DEOCHOA then used what he received to write an additional allegation in the Petition. The allegation provided by TRUSCOTT is new in the sense that it was not pulled from the First Dependency Petition. There is an important reason for that. The information that TRUSCOTT provided to JANSEN was determined by the Senior Prosecuting Attorney for King County to be compromised and tainted. Therefore, he refused to use the information in the Seattle case. The information was connected to a second interview with C.W. that was established through deceptive and corrupt means. What became apparent to the Prosecutor was that TRUSCOTT, BROWN, and C.W.'s grandmother conspired to justify a reason for a second interview. Their joint activity involved deceptive action that included the writing of a fraudulent note along with outright coercion of C.W. As the Prosecuting Attorney became aware of the facts surrounding the interview, the decision was made to not use the information. By that time, the exposure of TRUSCOTT's pattern of misconduct facilitated the decision to disregard the interview. TRUSCOTT's pattern of conduct to unduly influence the CPS case again confirms her level of disregard for conduct becoming of a police officer, and her complete indifference to the Constitutional rights of others.

## DECEPTIVE ACTS BY CPS

**82** To write and justify the Second Dependency Petition, CPS engaged in wrongful action. The wrongful action included misrepresentation, distortion, and omission of material fact. The action ranged from basic deception to unlawful acts which violated clearly established Constitutional rights. The intent to

use such action was to prevent the Commissioner from having command of the facts of the case. The first deceptive act was to take settled and closed allegations from the Seattle case, reboot them, and then sell them to the Commissioner as urgent and ongoing. As a result, the Commissioner spent five months believing that the multiple allegations on the Petition were ongoing. The Commissioner did not grasp that the Second Petition could be reduced to a single allegation. This fact was eventually brought to her attention by the State Assistant Attorney General. He unexpectedly interceded by filing for a Hearing to Dismiss Meeting. At that hearing, he explained to the Commissioner that the State had no legal standing for detaining C.W. based on Gold's Gym, and that C.W. should be immediately released to his parent's care.

**83** A second deceptive act was the effort by CPS to distort and misrepresent a relevant Stipulation from a King County Superior Court Judge. The Judge had included a written Stipulation in a Sentencing Memorandum. The Judge authorized work-outs between C.W. and John with the intent to preempt any type of blowback from an agency such as CPS. Her single condition which remained in effect for one year was that an adult be present. DEOCHOA and others were in possession of the Stipulation when they convinced the Commissioner to grant a court order to seize C.W. based on imminent harm. This omission of material fact from the Commissioner was followed by additional deceptive actions by CPS. CPS further deceived the Commissioner by writing the Stipulation in a nonsensical manner in the Dependency Petition. The intent of the distorted writing was to make the meaning of the Stipulation undiscernible to the Commissioner. This allowed for CPS to disclose the Stipulation without giving away the actual meaning or intent. CPS knew that revealing the actual meaning or intent would vitiate their justification for seizing C.W., which was tethered to the Gold's Gym workout.

**84** A third deceptive act was the deliberate omission of exculpatory evidence by a number of CPS officials. The officials include DEOCHOA, Case-manager LUND, and Supervisor GOURLEY. CPS conspired to omit and suppress testimony from a key witness who they had interviewed. The key witness was the Senior Prosecuting Attorney for King County who had resided over the Seattle Case. The testimony the prosecutor gave to the Tri-City officials was clearly exculpatory and would have vitiated probable cause based on the Gold's Gym workout. CPS suppressed this testimony from the Commissioner for a number of months. The exculpatory testimony was not disclosed until the Motion to Dismiss Hearing. By this time, C.W. had been in State custody for over five months. The disclosure was used by the State Assistant Attorney General as part of his reason for asking that all charges brought forth by CPS be dismissed, and that C.W. be immediately released from State custody. The main reason given by the Assistant Attorney General for closing the case was his position that CPS had no basis for seizing C.W. He further explained that the State would not prevail if the case moved forward.

### COMMISSIONER POTTS

**85** The Commissioner residing over the Second Dependency Petition was misled by CPS officials. CPS used misrepresentation, omission, and distortion of material fact to keep the Commissioner from recognizing the relevant issues. This hampered the Commissioner from performing her duties in a fair and impartial manner. The Commissioner operated for months thinking the allegations before her were multiple and ongoing, when in fact they were not. The Commissioner placed a level of trust toward the CPS officials that was not earned. She fully accepted that the entire Dependency was relevant, when in fact it was not. The Commissioner was distracted and misled to the point that she could not discern that the case hinged on whether CPS was justified in seizing C.W. based on the Gold's Gym workout. For months, the

Commissioner did not have clarity that the legal issue was Gold's Gym. What finally reached her was the unexpected action of the Assistant Attorney General for Washington State. He felt compelled to step forward and make a full and convincing argument to a Commissioner who was initially disbelieving. He argued that the State needs to dismiss the case and release C.W. immediately. The reason given to a stunned and confused Commissioner was that CPS had no basis for seizing C.W.

86 Because the Commissioner was deceived by CPS officials, several of her decisions were made that were not supported by material and relevant fact. Even though CPS unduly influenced her decisions, she was not free of judicial errors. Several key decisions caused substantive and procedural due process violations of the Constitution. As a result, Duane, Rachelle, and C.W. were unjustly harmed.

87 The first judicial error by the Commissioner was the ease in which she granted CPS a court order to seize C.W. If the Commissioner had exercised adequate judicial review, the emergency action by CPS would have been denied based on the number of days that had elapsed since the Gold's Gym work-out. CPS could not have reconciled the passage of twenty-five days with the need to seize C.W. based on imminent harm or danger. The lapse of time defeated a need for emergency action. The fact that the court order to seize C.W. was granted during an ex-parte hearing is a procedural due process violation. Again, the elapse of twenty-five days since the Gold Gym's workout negates any argument that the need for emergency action justifies not having pre-deprivation notice and hearing. Furthermore, an ex-parte hearing did not give Duane and Rachelle the opportunity to be heard at a meaningful time and in a meaningful manner. The post-deprivation hearings contained judicial decisions and oversight that were also procedural due process violations. The Commissioner failed to ensure a number of post-deprivation procedures that are guaranteed rights protected by federal law. If emergency action was necessary due to imminent harm to C.W., due process requires that judicial review of the reason for emergency action is adequate and promptly accorded. This type of judicial review did not occur during post-deprivation hearings. The Commissioner was neither prompt nor adequate in requiring CPS to defend their reason for resorting to emergency action to seize C.W. As a result, CPS did not justify the emergency action, and the legitimacy of their action remained unratified. Instead, the Commission agreed with CPS that the proceedings would move in another direction. For Duane and Rachelle, this direction was a game changer which caused additional harm. The harm included five unwarranted months of anxious and futile effort to comply with a directive that was fundamentally unjust as their son remained in State custody.

## THE GAME CHANGER

88 The game changer was that Duane and Rachelle were directed to obtain a Harassment Protection Order from the Benton County Superior District Court. The Protection Order was to be written against John. The directive was coupled with the warning that this condition had to be met before the Commissioner would consider releasing C.W. It was expressed that the Commissioner wanted a Harassment Order in place before proceeding. This directive was expressed by individuals other than CPS and the Commissioner. Those individuals include CPS defense attorneys who knew how the Tri-City Juvenile Justice System worked. It was explained to Duane and Rachelle that 'requiring a Harassment Order was a practice that has been used by the Commissioners for years'. Duane and Rachelle were forced into the position of filing for a Harassment Order they did not need nor want. Neither Duane, Rachelle nor C.W. felt they were being harassed in any manner by John. To obtain a Harassment Order meant that Duane and Rachelle would have to commit perjury by giving false statements to a District Court Judge. They felt corned and compromised

but had no choice but to comply. The reason can be universally understood. They desperately wanted their son back. Duane and Rachelle spent several months trying to get a Protection Order in place. After a number of futile attempts, a Benton County District Court Judge blocked their effort. Her written decision was that the matter of a Protection Order cannot be granted in District Court due to Duane and Rachelle's circumstances. The Judge's opinion was that there was no place in the Superior Court System for granting a Protection Order based on the need to satisfy a CPS directive. The Judge referred the issue back to the Juvenile Justice System.

**89** Coercing Duane and Rachelle to obtain a Harassment Protection Order was unlawful and fundamentally wrong for several reasons. First, the State cannot leverage parents by holding a son hostage in order to force the parents to seek a Protection Order. Duane and Rachelle should not have to fabricate an urgency that does not exist in order to obtain a Protection Order they do not need or want. To use a Harassment Protection Order in this manner is a travesty of the Justice System. Second, Duane and Rachelle should not have to commit perjury in order to comply with a directive given by CPS. For CPS to require compliance by means of perjury is a Substantive Due Process Violation of the Constitution. The State cannot force or expect Duane and Rachelle to perjure themselves. Third, it is an Abuse of Process to use judicial resources in an improper manner to coerce a person to do something legally they would not normally do. This form of Abuse of Process qualifies as a Procedural due process violation of the Constitution. Coercing Duane and Rachelle to legally seek a Harassment Protection Order that they did not want or need is an Abuse of Process. Forcing Duane and Rachelle to use the District Superior Court system to secure a Harassment Protection Order is using the judicial resources of the District Court in an improper manner. Coercing parents to legally seek a Harassment Protection Order where the purpose is to exchange the Order for their child is not the intended purpose of the Order, nor do the circumstances meet the criteria the Order was created to address. Going one step further, CPS has violated the Constitution by implementing the directive of coercing parents to obtain Harassment Orders as a condition that must be met before their child is released from State custody. Forcing parents to do so in order to regain custody of their child has become a wide-spread practice of the Tri-City Juvenile Justice System. This practice of using Harassment Orders in this unlawful manner is not found in express written CPS policy or written law. What is significant is that the unlawful practice of coercing parents to obtain a Harassment Order is so permanent and well-settled in the Tri-Cities Juvenile Justice System that it has become a 'custom or usage' that has the force of a law.

## CONSTITUTIONAL VIOLATIONS

**90** The Second Dependency Petition resulted in a series of Constitutional violations. The violations were against a number of Substantive and Procedural due process rights that are protected by the 4th and 14th Amendments of the Constitution. The series of Constitutional violations should begin with the decision by CPS to seize C.W. from Duane and Rachelle's custody and control. The basis for seizing C.W. was the work-out at Gold's Gym. The Gold's Gym work-out does not qualify as a legally sufficient reason for CPS to place C.W. into State custody. The ensuing CPS investigation conducted by Marco was not able to find specific and articulable evidence that would create a reasonable cause to believe that C.W. was in any type of imminent harm or danger. There is a reason for the absence of evidence. C.W. was not in any type of imminent harm or danger. This includes his life with his family and the work-outs with John at Gold's Gym.

**91** A touchstone of the 4th Amendment in evaluating the legitimacy of a seizure is the condition for reasonableness. Seizing C.W. based on the Gold's Gym workout absent specific and articulable evidence

does not meet the standard of being reasonable. The lack of evidence makes the seizure of C.W. a violation of the 4th Amendment. The fact that CPS waited a full twenty-five days before seizing C.W. further supports that the State was not concerned about C.W. being subjected to imminent harm or danger. If CPS holds the positon that they were concerned then they were neglectful and consequently liable in their delayed response to the perceived threat.

**92** Another 4th Amendment violation was the manner that CPS misled the Commissioner in order to be granted a court order to remove C.W. from the parent's custody. Marco and other officials were in possession of a Stipulation when they convinced the Commissioner to grant the order to seize C.W. The Stipulation was written by a Judge that authorized work-outs between C.W. and John. The Stipulation was material to the case. CPS omitted the Stipulation from the Commissioner. The omission was crucial in persuading the Commissioner to grant the court order to seize C.W. The information that CPS possessed at the time they were asking for a court order can be compared with the standards used for probable cause for a warrant. Probable cause can contain hearsay or information gathered hastily, but implicit in respect to reasonableness under the 4th Amendment is that the information upon which the official proceeds is not known to be false. This applies to omissions and misstatements if the judge or Commissioner was misled by them. In regard to misstatements, the decision to grant a court order was influenced by a Dependency Petition that CPS knew was founded on distortions and misrepresentations. CPS also knew that the allegations in the Petition had been settled and closed, but convinced the Commissioner that the allegations were ongoing and current. The omission of the Stipulation while the Commissioner was granting the court order renders the seizure unconstitutional under the 4th Amendment. The use of a Petition that CPS knew was founded on distortions and misrepresentations which the Commissioner based her decision to grant the court order also makes the seizure unlawful under the 4th Amendment.

**93** There were several 14th Amendment violations of the Constitution. These violations were Substantive and Procedural due process violations. Duane and Rachelle were deprived of their right to familial integrity and privacy when C.W. was seized. They were also deprived of their fundamental liberty interest in the care, custody, and management of C.W. These two Substantive due process rights are deeply rooted in the Nation's history. Duane and Rachelle cannot be deprived of these Substantive rights without due process of law. Procedural due process includes the right for Duane and Rachelle to have a pre-deprivation notice and a hearing before C.W. can be seized. The State violated this right by not having the hearing before seizing C.W. There is an exception which allows for not having a pre-deprivation notice and a hearing. The exception requires an 'extraordinary situation' where a valid government interest is at stake that justifies postponing the hearing until the child has been seized. A 'valid government interest' includes emergency circumstances where there is an immediate threat to the safety of a child. The mere possibility of danger is not included in this exception. The Gold's Gym work-out does not qualify as an 'extraordinary situation'. CPS confirmed through inaction that there was no immediate threat to C.W. CPS showed their level of concern by letting twenty-five days elapse following the workout before seizing C.W. The manner in which CPS treated the Gold's Gym workout defeats any legal standing that Duane and Rachelle should have been denied a pre-deprivation notice and a hearing.

**94** There were additional 14th Amendment Procedural due process violations. During an ex-parte hearing, CPS was granted a custody order by the Commissioner to seize C.W. Duane and Rachelle were prevented from attending. Without their knowledge or participation their rights as parents were effectively

denied.  It is a Procedural due process violation to deny the parental rights of Duane and Rachelle without giving them the opportunity to be heard at a meaningful time and in a meaningful manner.  Several Procedural due process violations also occurred during the post-deprivation hearings.  The post-deprivation hearings did not address the emergency action by CPS that justified not having a pre-deprivation notice and a hearing.  The emergency action was based on Gold's Gym.  Since there was no prompt and adequate judicial review the requirement to ratify the emergency action did not occur.  The result was that CPS was not pressed by the Commissioner to justify their reason for removing C.W. based on the Gold's Gym workout.  For Duane and Rachelle, to be denied judicial review of the emergency action in a prompt and adequate manner so the emergency action can be ratified by the court is yet another Procedural due process violation.

**95** The post-deprivation hearings moved in a direction which caused further 14th Amendment violations to Duane and Rachelle.  The directive by the Commissioner for a Harassment Protection Order resulted in both Substantive and Procedural due process violations.  Requiring Duane and Rachelle to seek a Harassment Order before consideration would be given to release C.W. from State custody is a clear Abuse of Process.  The manner in which the Commissioner applied the Harassment Order is not the intended purpose of the Order, nor does it meet the threshold of what the Order was created to address.  Using the Benton County District Court and coercing Duane and Rachelle to secure a Harassment Order that they do not need nor want meets the definition of an Abuse of Process.  That is, using judicial resources in an improper manner to coerce the victim to do something legally they would not normally do.  To place this condition on Duane and Rachelle is a Procedural due process violation of the 14th Amendment.  In addition, the ease and frequency that the Harassment Order was misused by the Juvenile Justice System in the Tri-Cities meets the threshold of a de-facto policy that caused Constitutional harm.  The unlawful use of the Harassment Order is a wide-spread practice that is not supported by written law or express policy but is so well-settled and permanent that it has become a custom or usage that has the force of a law.  On a larger scale in respect to an unlawful policy implemented by CPS, Duane and Rachelle have been harmed.  Again, to coerce Duane and Rachelle to comply with this unlawful practice is a Procedural due process violation of the 14th Amendment.  In addition, Duane and Rachelle were coerced into a compromising position by having to provide false statements in a District Court in the attempt to convince the judge that there were legitimate reasons for needing a Harassment Protection Order.  The underlying conflict involved the absence of harassment to report yet the Commissioner wanted a Harassment Protection Order in place before releasing C.W.  This is a fundamental Substantive due process violation of the 14th Amendment of the Constitution.  Primarily, Duane and Rachelle should not be coerced by the State into having to commit perjury in exchange for their son to be released from State custody.

---

*FIRST CLAIM FOR RELIEF COUNTS 1,2,3,4,5,6, and, 7 FOR VIOLATION OF FEDERAL CIVIL RIGHTS (42 U.S.C §1983) Fourteenth Amendment Due Process Unreasonable seizure of C.W. in violation of Plaintiffs' Fourteenth Amendment Substantive Due Process Right to Familial Association.*

---

**96** Plaintiff realleged, and to the extent applicable, incorporates herein as if set forth in full, all paragraphs above, and all paragraphs below.

**97** Plaintiffs are an individual and citizen of the United States, protected by 42 U.S.C. §1983.

**98** At all times relevant to this complaint, DEFENDANTS were acting under color of state law and had a duty to honor Plaintiffs' Constitutional rights. Plaintiffs are informed and believe and thereon allege that the right to familial association guaranteed under, without limitation, the and Fourteenth amendments to the United States Constitution is "clearly established" such that a reasonable social services agent or government official in Defendants' situation would know it is unlawful to seize a child from the care, custody, and control of its parents in the absence of exigent circumstances without first providing parents with notice and an opportunity to be heard prior to obtaining a warrant. The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies.

**99** At all times relevant herein, there was a well elaborated constitutional right [for families] to live together without governmental interference." [1]

**100** The issue at stake is the fundamental rights of the parents weighed against justifiable action by the government. The due process clause of the Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 Led.2d 49 (2000). This heightened protection encompasses the right of parents to the "care, custody, and management" of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). In the context of forcefully removing a child from the parents, the "touchstone of the Fourth Amendment is reasonableness." Snell v. Tunnell, 920 F.2nd at 697 (10th Cir.1990). The Fourth and Fourteenth Amendments share the same legal standards in respect to any effort by the State to remove a child. (citing *Stanley,* 405 U.S. 645, 651 (1972)). Wallis *Id.* at 1138.

**101** The Wallis court made clear the boundaries of reasonable cause; The existence of reasonable cause, and the related questions, are all questions of fact to be determined by the jury. McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir.1984) (per Kennedy, J.); Smiddy v. Varney, 665 F.2d 261, 265 (9th Cir.1981) (per Sneed, J.) Summary judgment in favor of the defendants is improper unless, viewing the evidence in the light most favorable to the plaintiffs, it is clear that no reasonable jury could conclude that the plaintiffs' constitutional rights were violated.

**102** [Government officials] cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been-or will be-committed. Whether a reasonable avenue of investigation exists, however, depends in part upon the time element and the nature of the allegations. *Id.; see also* Hurlman v. Rice, 927 F.2d 74, 81 (2d Cir. 1991) (warning of the negative consequences that would result if the "mere possibility" of danger constituted an emergency). Private entitites can be held accountable under 1983. "To act 'under color of' state law for §

---

[1] Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 2000); accord Kirkpatrick v. Cty. of Washoe, 843 F.3d 784, 789 (9th Cir. 2016) (en banc); Burke v. Cty. of Alameda, 586 F.3d 725, 731 (9th Cir. 2009); Rogers v. Cty. of San Joaquin, 487 F.3d 1288, 1294 (9th Cir. 2007); Mabe v. San Bernardino Cty., 237 F.3d 1101, 1107 (9th Cir. 2001); Ram v. Rubin, 118 F.3d 1306, 1310 (9th Cir. 1997).

1983 purposes does not require that the defendant be an officer of the State." Dennis v. Sparks, 449 U.S. 24, 27 (1980). "It is enough that he is a willful participant in joint action with the State or its agents." Id. at 28; see also Howerton v. Gabica, 708 F.2d 380, 382 (9th Cir. 1983). Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1301 (9th Cir. 1999). The agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants. (Id. at 1301-1302.) Plaintiffs need only allege a meeting of the minds as to the object that ultimately caused the constitutional violation – not a meeting of the minds to violate Plaintiff's constitutional rights by performing the agreed conduct. See United Steelworkers of Am., 865 F.2d 1539, 1541 (9th Cir. 1989); Fonda v. Gray, 707 F.2d 435, 437 (9th Cir. 1983). Furthermore, liability for each individual in the conspiracy accrues when the participant shares in the common objective of the conspiracy, regardless of whether they know the full details of the plan. Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2002). Just as in United States v. Wiseman, *supra*, 445 F.2d at 796, Sugarman v Perez 2nd circuit (1974) "directly involves defendants' mode of conducting the public function and does not involve a collateral aspect of" the business of operating an institution which cares for children. The existence of this nexus has made the courts more receptive to a finding of "state action." See, e. g., id. at 796. The governmental nexus test, is one of at least four different tests used by courts to determine whether sufficient state involvement exists to support the conclusion that a 'private actor' has acted "under color of state law." See Howerton v. Gabica, supra, 708 F.2d 380, 382-383 (9th Cir. Idaho 1983). [2]

In respect to consensual child seizures, "Consent" that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse. Florida v Bostic (S. Ct. 1991). The fourth amendment's protection against unreasonable seizures is triggered " 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to [**take their child and leave**].' " United States v. Rose, 889 F.2d 1490, 1493 (6th Cir.1989) (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Coercive or intimidating behavior supports a reasonable belief that compliance is compelled.[3]

**103** Coercion can be mental as well as physical. Blackburn v. Alabama 361 U.S. 1999, 2016 (1960). The separation does not have to be carried out with force for due process to be implicated; instead, duress or coercion will be sufficient, such as where a social-services worker threatens to place the children in foster care if the children are not "voluntarily" placed outside of the home with family or friends. *Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d. Cir. 1997); *Dupuy v. Samuels*, 462 F.Supp.2d 859 (N.D. Ill. 2005), aff'd, 465 F.3d 757 (7th Cir. 2006).

---

§ 1983 *has* served as a vehicle for bringing suit against corporate entities. See, e. g., Palmer v. Columbia Gas of Ohio, Inc., 479 F.2d 152 (6 Cir. 1973); Bronson v. Consolidated Edison Co., 350 F.Supp. 443 (SDNY 1972); Stanford v. Gas Service Co., 346 F.Supp. 717 (D.Kan. 1972).

[3] United States v. Collis, 766 F.2d 219, 221 (6th Cir.), cert. denied, 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985) see also Cassady v. Tackett. Consent to warrantless entry must be voluntary and not the result of duress or coercion. Lack of intelligence, not understanding the right not to consent, or trickery invalidate voluntary consent. Schneckloth v. Bustamonte. One's awareness of his or her right to refuse consent to warrantless entry is relevant to the issue of voluntariness of alleged content. Lion Boulos v. Wilson. The exigent circumstances exception to the warrant clause only applies when 'an immediate major crisis in the performance of duty afforded neither time nor opportunity to apply to a magistrate.' 342 N.W.2d 851, 855 (Iowa 1983) State v Hatter (1983).

{FIRST AMENDED COMPLAINT}   **PAGE 25**

**104** Defendants, and each of them, had and have an affirmative duty and obligation to recognize the constitutional rights of parents and conduct themselves in a manner that confirms, protects, and does not violate the protections guaranteed Plaintiffs under the United States Constitution, including those substantive and procedural rights arising under the Fourteenth Amendments, to include without limitation, the protection of parental rights, the right to privacy, family integrity, and the right to familial relations. The government may not interfere with constitutional rights, including the prior provision of procedural due process, the subsequent provision of substantive due process, the right to free speech, the right to be free from coercion, the right to petition for the redress grievances, and the right be free from search and seizure.

**105** The violation(s) were proximately caused by a person under color.

**106** FIRST CLAIM, COUNT 1: By Plaintiffs against defendants CHOW, and DOES 1-100, inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to family association. Plaintiffs are informed and believe and thereon allege that on approximately June 23, 2014, an unreasonable seizure occurred when C.W. was held at the hospital and not free to leave. Defendants and each of them were acting under color of state law when – in JUNE 2014 – **they seized**, or agreed and conspired **to unlawfully seize**, remove, and/or detain **C.W. in the absence of obtaining a Court Order. No exigent circumstances existed** which might excuse said failure to obtain a court order prior to said seizure. Defendants knew or should have known that there was **no basis** to do so. Said conduct therefore constitutes a violation of Plaintiff's rights guaranteed by the Fourteenth Amendments to the United States Constitution.

**107** FIRST CLAIM, COUNT 2: By Plaintiffs against defendants BROWN, TRUSCOTT, SMITH, WEISTER and DOES 1-100, inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to family association. Plaintiffs are informed and believe and thereon allege that on June 25, 2014, an unreasonable seizure occurred when C.W. was taken into custody. Defendants and each of them were acting under color of state law when – in JUNE 2014 – **they seized**, or agreed and conspired **to unlawfully seize**, remove, and/or detain **C.W. in the absence of obtaining a Court Order. No exigent circumstances existed** which might excuse said failure to obtain a court order prior to said seizure. Defendants knew or should have known that there was **no basis** to do so. Said conduct therefore constitutes a violation of Plaintiff's rights guaranteed by the Fourteenth Amendments to the United States Constitution.

**108** FIRST CLAIM, COUNT 3: By plaintiffs against defendants BROWN, TRUSCOTT, DEOCHOA, and DOES 1-100, inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to family association. Plaintiffs are informed and believe and thereon allege that on June 27th, 2014 a second unreasonable seizure/detainment as the result of coercion. Defendants and, each of them, were acting under color of state law when – in JUNE 2014– they coerced plaintiffs' into signing a voluntary placement agreement (VPA) revoking police custody, or agreed and conspired to **unlawfully seize,** remove, and/or detain C.W. in the absence of obtaining a Court Order **No exigent circumstances existed which might excuse said failure to obtain a court order prior to said seizure**. Defendants knew or should have known that there was **no basis** to do so. Said conduct therefore constitutes a violation of Plaintiff's rights guaranteed by the Fourteenth Amendments to the United States Constitution.

**109** FIRST CLAIM, COUNT 4: By Plaintiffs against Defendants BROWN, TRUSCOTT, CHOW and DOES 1-100, inclusive, in violation to the right to family association. Plaintiffs are informed and believe and thereon allege that on approximately June 30th, 2014, an unreasonable seizure/detainment of C.W. occurred when Defendant Chow issued a medical hold at Seattle Children's Hospital, a hold that was pre-determined by BROWN. Defendants, and each of them, were acting under color of state law when – in JUNE 2014 and/or JULY 2014 – they **seized**, or agreed and conspired to **unlawfully seize**, remove, and/or detain C.W. in **the absence of obtaining a Court Order. No exigent circumstances existed** which might excuse said failure to obtain a court order prior to said seizure. Defendants knew or should have known that there was **no basis** to do so. Said conduct therefore constitutes a violation of Plaintiff's rights guaranteed by the Fourteenth Amendments to the United States Constitution.

**110** FIRST CLAIM, COUNT 5: By Plaintiffs against Defendants, BROWN, TRUSCOTT, and DOES 1-100, inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to familial association. Plaintiffs are informed and believe and thereon allege that on approximately July 1st, 2014, an unreasonable seizure/detainment of C.W. occurred when TRUSCOTT again took C.W. into custody, in a seizure that was not court ordered. Defendants and each of them, were acting under color of state law when – in JUNE 2014 and/or JULY 2014 – they **seized**, or agreed and conspired to unlawfully seize, remove, and/or detain C.W. in **the absence of obtaining a Court Order. No exigent circumstances existed** which might excuse said failure to obtain a court order prior to said seizure. Defendants knew or should have known that there was **no basis** to do so. Said conduct therefore constitutes a violation of Plaintiff's rights guaranteed by the Fourteenth Amendments to the United States Constitution.

**111** FIRST CLAIM, COUNT 6: By Plaintiffs against Defendants; BROWN, TRUSCOTT, DEOCHOA, and DOES 1-100, inclusive, in violation to the right to familial association. Plaintiffs are informed and believe and thereon allege that on approximately July 3rd 2014, an unreasonable seizure/detainment occurred. Defendants and each of them, were acting under color of state law when – in JULY 2014 – they **seized**, or agreed and conspired to **unlawfully seize**, remove, and/or detain C.W. using **trickery, deception, coercion, and duress** to gain compliance from Plaintiffs. DEOCHOA signed and submitted, under penalty of perjury, misleading and distorted evidence to the juvenile court. **The Shelter Care order was obtained by submitting distorted and misleading evidence to the Judge.** There was no prompt judicial review ratifying the emergency action that was in any way adequate. Defendants knew or should have known that there was **no basis** to continue to hold on to C.W. Said conduct therefore constitutes a violation of Plaintiff's rights guaranteed by the Fourteenth Amendments to the United States Constitution. Before, during and after this proceeding, Plaintiffs, were **coerced**. Said conduct therefore constitutes a violation of Plaintiff's rights guaranteed by the Fourteenth Amendments to the United States Constitution.

**112** FIRST CLAIM, COUNT 7: By Plaintiffs against DEOCHOA, JANSEN, TRUSCOTT, BROWN, WEISTER, DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to familial association. Plaintiffs are informed and believe and thereon allege that omissions, distortions, and misrepresentation presented in the juvenile court caused the unreasonable seizure of C.W. on January 27, 2016. Defendants, and each of them, were acting under color of state law when they agreed and/or conspired to **unlawfully seize**, remove, and/or detain C.W., and in fact did seize C.W. – in JANUARY 2016 – using a court order that was granted by a commissioner who was misled by a

vast amount of misinformation including omissions, distortions, and misrepresentations. Pre-deprivation procedures were lacking. There were reasonable avenues of investigation that were not pursued, pre-deprivation notice and a hearing were not provided, even when no emergency existed, and CPS failed to present complete and accurate evidence to the court. **No exigent circumstances existed which might excuse said failure to provide Plaintiffs with notice and an opportunity to be heard prior to the seizure**. Defendants knew or should have known that there was **no basis** to do so. Said conduct therefore constitutes a violation of Plaintiff's rights guaranteed by the Fourteenth Amendments to the United States Constitution.

**113** FIRST CLAIM, COUNT 8: By Plaintiffs against Defendants; LUND, GOURLEY, and DOES 1-100, inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to familial association. Plaintiffs are informed and thereon allege that the continued detention of C.W. was unreasonable under the Fourth and Fourteenth Amendment and a violation of the Right to Family Association. The violation occurred between January 2016 and June 2016. Defendants and each of them, were acting under color of state law when – in JANUARY 2016 through JUNE 2016 – they seized, and/or agreed and **conspired to continue to detain C.W**. Plaintiffs were not provided with notice and an opportunity to be heard prior to a Commissioner granting a Court Order to take C.W. into custody. **The right to notice and a hearing did not vanish**. Notice and an opportunity to be heard at a meaningful time in a meaningful manner are required. Defendants had a duty to provide a prompt and adequate post-deprivation judicial review to ratify emergency action, because this was a child custody case. None of that occurred. The unreasonable seizure of their son placed duress on Plaintiff's. Defendants knew or should have known that there was **no basis** to continue to detain C.W. for months. A protection order requirement was used as leverage to coerce and trick Plaintiffs. **Defendants suppressed exculpatory evidence material** to the case, that was suppressed for months. Said conduct therefore constitutes a violation of Plaintiff's rights guaranteed by the Fourteenth Amendments to the United States Constitution.

**114** Defendants, and each of them, maliciously violated and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiffs' rights found in the Fourteenth Amendment of the United States Constitution, by, but not limited to, removing, detaining, and continuing to detain the minor, otherwise causing C.W. to continue to be detained from his parents' care, custody, and control without proper or just cause and/or authority, and by use of coercion, duress, or fraud. Said acts were taken deliberately, with callous or reckless indifference to the substantial rights of Plaintiffs, or fueled by an evil motive or intent.

**115** As a direct and proximate result of the misconduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things.

**116** Plaintiffs are therefore entitled to recover punitive damages from Defendants, and each of them, as permitted by law and as according to proof at trial, due to the wrongful conduct of defendants as herein alleged.

**117** Defendants, and each of them, maliciously violated and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiffs' rights found in the Fourteenth Amendment of the United States Constitution, by, but not limited to, removing, detaining, and continuing to detain the minor, otherwise causing C.W. to continue to be detained from his parents' care, custody, and control without proper or just

cause and/or authority, and by use of coercion, duress, or fraud. Said acts were taken deliberately, with callous or reckless indifference to the substantial rights of Plaintiffs, or fueled by an evil motive or intent.

**118** As a direct and proximate result of the misconduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things.

**119** Plaintiffs are therefore entitled to recover punitive damages from Defendants, and each of them, as permitted by law and as according to proof at trial, due to the wrongful conduct of defendants as herein alleged.

### SECOND CLAIM FOR RELIEF COUNTS 1, 2, and 3
#### Fourteenth Amendment – Substantive Due Process
*A parent has a liberty interest in familial association and therefore a right to be free from deception in the presentation of evidence.*

**120** Plaintiff realleged, and to the extent applicable, incorporates herein as if set forth in full, all paragraphs above, and below.

**121** At all times relevant to this complaint, DEFENDANTS were acting under color of state law and had a duty to honor Plaintiffs' Constitutional rights. Plaintiffs are informed and believe and thereon allege that the right to be free from deception in the presentation of evidence, without limitation, the Fourteenth amendment to the United States Constitution is "clearly established" such that defendants had the affirmative and self-evident duty to be truthful, accurate, and complete in petitions, reports and evidence that would eventually be relied upon by the juvenile court – a court with power to adjudicate substantial rights, including legal and custodial rights of children and parents. Similarly, defendants had an equal duty to refrain from using improper and deceptive means to obtain judicial orders sustaining recommendations disparaging and/or otherwise impairing or impinging upon Plaintiff's due process rights. The Fourteenth Amendment guarantees Parents the right to be free from deception in the presentation of evidence.

**122** At all times relevant herein, there existed a clearly established due process right of individuals not to be subjected to false accusations by government officials, including the deliberate presentation of false or perjured evidence, and/or by the suppression of exculpatory information in court proceedings or in documents submitted with recommendations or requests made to the court.

**123** In the context of a seizure of a child by the State during an investigation, a court order is the equivalent of a warrant." Tenenbaum v. Williams 193 F.3d 581, 602 (2nd) Cir. 1999. Obtaining a court order by deceiving a judge or commissioner in order to obtain judicial authorization is unjustifiable and therefore unreasonable. The standard of reasonableness established by legal precedent makes this type of seizure a clear violation of the Fourth, and by direct effect, [a violation of] the Fourteenth Amendment of the Constitution. Arapahoe County Dept. of Social Services, 191 F.3d 1306, 1315 (10th Cir. 1999). "Government officials' procurement of a court order to remove children based on information they knew was founded on distortion, misrepresentation and omission, violates the Fourth Amendment". An officer

who obtains a warrant through material false statements which result in an unconstitutional seizure may be held liable personally for his actions under section 1983. False statements made to obtain a warrant, when the false statements were necessary to the finding of [reasonable cause] on which the warrant was based, violates the Fourth Amendment's warrant requirement. The warrant clause contemplates the warrant applicant to be truthful: "no warrant shall issue, but on [reasonable cause], supported by oath or affirmation." Deliberate falsehood or reckless disregard for the truth violates the warrant clause. When a warrant application is materially false or made in reckless disregard for the truth, the warrant becomes invalid and will have been obtained in violation of the Fourth Amendment's warrant clause. Aponte Matos v Toldeo Davilla (1ˢᵗ Cir. 1998). Aponte Matos v. Toledo Davilla (1st Cir. 1998). See also Brokaw v Mercer County (7ᵗʰ Cir. 2000). The Supreme Court held that the knowing use of false testimony by a prosecutor in a criminal case violates the <u>Due Process Clause</u> of the <u>Fourteenth Amendment to the United States Constitution</u>, even if the testimony affects only the credibility of the witness and does not directly relate to the innocence or guilt of the defendant. Nakupe v. Illinois (1959) 360 U.S. 264, 269; Under Pyle v. Kansas, **317 U.S. 213**, 216 (1942), the knowing use by the prosecution of perjured testimony in order to secure a criminal conviction violates the Constitution. While Pyle does not deal specifically with the bringing of criminal charges, as opposed to the securing of a conviction, we find that the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious, and Pyle is sufficiently analogous, that the right to be free from such charges is a constitutional right. 'It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.'Mooney v. Holohan (1935) 294 U.S. 103 1 112.

**124** The Fifth Circuit in Morris v. Dearborne (1999) found that the state denied plaintiff the fundamental right to a fair procedure before having their child removed by the intentional use of fraudulent evidence during the procedure. Parents have a right to procedural due process. Any reasonable social services agent and/or government agent would know that it is a due process violation to lie, exaggerate, fabricate evidence, and/or suppress material exculpatory evidence in court reports and other documents filed with the juvenile court, and/ or relied upon by subsequent social workers. Implicit in the *Franks* concept of reasonableness under the Fourth Amendment "is that the information on which the social worker proceeds ... is not known to be false." *Snell*, 920 F.2d at 699. The *Franks* rule applies to omissions as well as affirmative misstatements if the magistrate or judge was misled by them. *DeLoach*, 922 F.2d at 621-22. The question comes down to whether the defendant's actions were objectively reasonable in light of the law and information the defendant possessed at the time of his actions. *Hollingsworth v. Hill*, 110 F.3d 733, 737 (10th Cir. 1997). ⁴

---

⁴ Therefore, "[a]n official satisfies the personal responsibility required of § 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." Smith v. Rowe, 761 F.2d 360, 369 (7th Cir.1985). Chism v. Washington State (9th Cir.2011) 661 F.3d 380, 388–389 (Chism), Under Chism, in order to demonstrate a violation of Plaintiffs' due process Right to be free from judicial deception "'a

**125** The Greene court reasoned: "[T]he right to be free from deception in the presentation of evidence during a protective custody proceeding was clearly established at the time Camreta [the child protective services worker] filed his affidavit with the Juvenile Court. In Devereaux v. Perez, 218 F.3d 1045 (9th Cir.2000) [reh'g en banc granted by 235 F.3d 1206 and reh'g en banc (2001) 263 F.3d 1070], the Ninth Circuit held in the context of a child abuse proceeding that 'the constitutional right to be free from the knowing presentation of false or perjured evidence' is clearly established.  Id. at 1055–56. Even earlier, we stated emphatically that 'if an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth, he cannot be said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost.' Hervey v. Estes, 65 F.3d 784, 788 (9th Cir.1995) (internal quotations and citation omitted); see also Butler [v. Elle (9th Cir.2002) 281 F.3d 1014, 1024]; Whitaker v. Garcetti (9th Cir.2007) 486 F.3d 572, 582 (concluding that 'the contours of the Fourth Amendment right against judicial deception' were clearly established by 1996).

**126** A defendant in a civil rights case is not entitled to any immunity if he or she gave false information either in support of an application for a search warrant or in presenting evidence to a prosecutor on which the prosecutor based his or her charge against the plaintiff. Young v. Biggers Fifth Cir. (1991)

**127** Malik v. Arapahoe County Dept. of Social Serv., 191 F.3d 1306, 1315 (10th Cir.1999) 'Government officials' procurement of a court order to remove children based on information they knew was founded on distortion, misrepresentation and omission, violated the Fourth Amendment); Malik v. Arapahoe County Dept. of Social Services, 191 F.3d 1306, 1315 (10th Cir.1999). Malik relies by analogy on *Bruning v. Pixler,* 949 F.2d 352, 356 (10th Cir.1991), which held in the context of arrest warrants that, "to knowingly or recklessly omit from the arrest affidavit information which, if included, would vitiate [reasonable cause]," constitutes a violation of a plaintiff's Fourth and Fourteenth Amendment right to be free from unreasonable seizures.  Technically true statements may be misleading if exculpatory evidence is omitted.  United States v Stanert (1985) 762 F.2d 775, 781; see, e.g., United States v. Reilly (2d Cir. 1996) 76 F.3d 1271 1280.

**128** In light of long-standing criminal prohibitions on making deliberately false statements under oath, [no government officer including Social Workers] could reasonably believe that he/she was acting lawfully in making deliberately false statements to the juvenile court in connection with the removal of a dependent child from a caregiver. Since qualified immunity protects officials 'who act in ways they reasonably believe to be lawful' (Garcia v. County of Merced (9th Cir.2011) 639 F.3d 1206, 1208), we think that it is

---

substantial showing of [the social workers'] deliberate falsehood or reckless disregard for the truth and establish that, but for the dishonesty, would not have occurred.' (Chism, supra, at p. 386.)  Social workers are entitled to qualified immunity unless they violated a "clearly established" constitutional right.  (Carroll, supra, 135 S.Ct. at p. 350.) In Greene v. Camreta (9th Cir.2009) 588 F.3d 1011, 1034–1035 (Greene ), vacated in part on other grounds by Camreta v. Greene (2011) _ U.S. _ [131 S.Ct. 2020] and vacated in part on other grounds by Greene v. Camreta (9th Cir.2011) 661 F.3d 1201, the Ninth Circuit concluded that, as of March 2003, a parent had a clearly established right not to be subject to judicial deception perpetrated by a [government official] securing an order removing a child from the parent's custody.  (Greene, supra, at p. 1035; see id. at p. 1018.)  Whether the alleged judicial deception was brought about by material false statements or material omissions is of no consequence, because by "reporting less than the total story, an affiant can manipulate the inferences a [judge] will draw." Liston v. County of Riverside (9ᵗʰ Cir. 1997) 120 F.3d 965, 973.  Due process is obstructed when government agents commit fraud on the courts. Northern Marina Islands v. Bowie (9ᵗʰ Cir, 2001) 243 F.3d 1109, 1125. There is no such thing as a minor amount of actionable perjury or of false evidence that is somehow permissible.  Social workers who give sworn testimony under oath function as a complaining witness. Kalina v Fletcher (1997) 522 U.S. 118, 130-131; Miller v Gammie (9ᵗʰ cir. 2003 335 F.3d 889, 897; Beltran v Santa Clara County (9ᵗʰ cir. 2008) 514 F.3d 906 9 908.

"virtually self-evident" (Devereaux, supra, 263 F.3d at p. 1075) that qualified immunity does not apply to such acts. (See Walker v. City of New York (E.D.N.Y.2014) 63 F.Supp.3d 301, 312 "It is axiomatic that a caseworker seeking the protection of qualified immunity cannot have utilized perjury and intentional fabrications during her investigation and in presenting a case to the Family Court".)

**129** The violation(s) were proximately by a person under color.

**130** SECOND CLAIM OF RELIEF, COUNT 1: By plaintiffs against Defendants DEOCHOA, BROWN, TRUSCOTT, SMITH, and DOES 1-100. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to be free from deception in the presentation of evidence. These defendants were acting under color of state law when they singularly and/or jointly acted, agreed, and/or conspired by acting or failing to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or the constitutional deprivation occurs at defendant's direction or with knowledge or consent by, but not limited to, engaging in deception in the presentation of evidence. **False evidence was included in a petition/declaration and submitted to the juvenile court under penalty of perjury in -JULY 2014-** and each of them, either singularly or jointly acted, and/or **conspired, to deliberately or recklessly provide false and/or distorted statements and/or omit known exculpatory evidence to DEOCHOA, who omitted exculpatory evidence and included the misrepresentations and distortions in the Petition and/or reports filed in the Juvenile Court**.

**131** SECOND CLAIM OF RELIEF, COUNT 2: By Plaintiffs against Defendants DEOCHOA, JANSEN, TRUSCOTT, BROWN, WEISTER, and DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to be free from deception in the presentation of evidence. Defendants were acting under color of state law when they either singularly or jointly acted, agreed, and/or conspired by acting or failing to act with a deliberate or reckless disregard of plaintiff's constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent by, but not limited to, engaging in deception in the presentation of evidence. **False evidence was included in a petition/declaration and submitted to the juvenile court in -January 2016-,** and each of them, either singularly or jointly acted, and/or conspired, to deliberately or recklessly present false and/or distorted statements and/or omit known exculpatory evidence to DEOCHOA, who omitted exculpatory evidence and included distortions, and misrepresentations in the petition and/or reports filed in the Juvenile Court.

**132** SECOND CLAIM OF RELIEF, COUNT 3: By Plaintiffs against Defendants LUND, GOURLEY, DEOCHOA, JANSEN, TRUSCOTT, BROWN, WEISTER, and DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to be free from deception in the presentation of evidence. Defendants, were acting under color of state law when they singularly and/or jointly acted, agreed, and/or conspired by acting or failing to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or the constitutional deprivation occurred at defendant's direction or with knowledge or consent by, but not limited to, engaging in deception in the presentation of evidence. **The false and misleading evidence was included in reports submitted, and exculpatory evidence was not submitted, to the juvenile court unitl -June 2016- even though it was available months earlier-.** Defendants and each of them, either singularly or jointly acted, and/or conspired, to deliberately or recklessly present false and/or distorted statements and/or omit known exculpatory evidence to CPS social workers who omitted exculpatory evidence and included distortions, and misrepresentations in petitions and/or reports filed with the Juvenile Court.

**133** This deceptive, coercive, and unconstitutional conduct caused and unreasonable seizure of C.W.'s and /or his prolonged detention from Plaintiff's care, custody, and/or control. Defendants action caused a violation of Plaintiffs Fourteenth Amendment due process rights.

**134** Defendants, and each of them, maliciously violated and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiff's rights found in the Fourteenth Amendment of the United States Constitution, by, but not limited to, engaging in deception in the presentation of evidence that was presented to the juvenile court, deliberately or recklessly presenting false and/or distorted statements and/or omitting known exculpatory material evidence. Said acts were taken deliberately, with callous or reckless indifference to the substantial rights of Plaintiffs, or fueled by an evil motive or intent.

**135** As a direct and proximate consequence of the misconduct of defendants, plaintiff has suffered, and will continue to suffer, damages, including but not limited to, physical and/or mental anxiety and anguish according to proof at trial.

**136** Plaintiffs are therefore entitled to recover punitive damages from Defendants, and each of them, as permitted by law and as according to proof at trial, due to the wrongful conduct of defendants as herein alleged.

---

### THIRD CLAIM FOR RELIEF COUNTS 1, 2, 3, and 4 Fourteenth Amendment – Procedural Due Process--A parent has a liberty interest in familial association and therefore a right to be free from misrepresentation of facts in order to obtain the removal of a child from [his/her] parents.

---

**137** Plaintiff realleged, and to the extent applicable, incorporates herein as if set forth in full, all paragraphs above and all paragraphs below.

**138** At all times relevant to this complaint, Defendants were acting under color of state law and had a duty to honor Plaintiffs' Constitutional Rights. Plaintiffs are informed and believe and thereon allege that when a child is removed from a parents' care, custody and control, the removal must not rely on the misrepresentation of facts. Defendants, and each of them, had the affirmative and self-evident duty to be truthful, accurate, and complete so that facts and events would not be misrepresented when removal of a child from his parents' custody is at stake. Misrepresenting the facts to justify removal of a child violates a parent's constitutional right to due process. A government agent or a Hospital Employee, or SCAN team member who have the power to seize a child in an investigation, among other things, would have known that this conduct violates Fourth Amendment rights of the child, and for Plaintiffs their Fourteenth Amendment Due Process rights.

**139** At all times relevant herein, there existed a clearly established due process right of individuals to be free from the misrepresentation of facts in order to obtain the removal of a child from his parents. "No matter how much process is required, at a minimum it requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents.

{FIRST AMENDED COMPLAINT}   **PAGE 33**

**140** The Fourth Amendment protection against unreasonable searches and seizures extends [] and includes conduct by social workers in the context of a child neglect/abuse investigation. Lenz v. Winburn (11th Cir. 1995). A social worker may not [seize a child] without a [court order] in absence of an emergency. Police officers and social workers are not immune for coercing or forcing [a child seizure] to investigate suspected child abuse, interrogation of a child, and strip search of a child, without a search warrant or special exigency. Calabretta v Floyd (9th Cir, 1999) 189 F. 3d 808. For purposes of the Fourth Amendment, a "seizure" of a person is a situation in which a reasonable person would feel that he is not free to leave, and also either actually yields to a show of authority from police or social workers or is physically touched by police. Persons may not be "seized" without a court order. California v. Hobari D. (1991) 499 U.S. 621 . Police officer[s] and social worker[s] may not conduct a warrant-less seizure in a suspected abuse case, absent exigent circumstances. Defendants must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is **reasonably necessary to alleviate the threat.** Good v. Dauphin County Social Services (3rd Cir. 1989). Brokaw v. Mercer County (7th cir. 2000) 235 F.3d 1000, 1020; The courts have held that removing a child from the parent's custody is reasonable if it is pursuant to a court order, if it is supported by [reasonable cause], or if it is justified by exigent circumstances. The **mere possibility of danger does not** constitute an emergency or exigent circumstance that **would** justify a forced warrantless entry and a warrantless seizure of a child. **Hurlman v. Rice** (2nd Cir. 1991).

**141** Wallis v Spencer [conclud[ed] that summary judgement was improper if a material question of fact exists regarding if [] [] (1) the information they possess at the time of the seizure [] provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and **(2) that the scope of the intrusion is reasonably necessary to avert that specific injury.** (see also Tomason v SCAN Volunteer Services.

**142** In *Snell,* the Tenth Circuit observed that **the touchstone of the Fourth** [and **Fourteenth] Amendment is REASONABLENESS.** 920 F.2d at 697. The question comes down to whether the defendant's actions were objectively reasonable in light of the law and information the defendant possessed at the time of his actions. *Hollingsworth v. Hill,* 110 F.3d 733, 737 (10th Cir. 1997).

**143** The VIOLATION(s) were PROXIMATELY CAUSED by a PERSON UNDER COLOR

**144** THIRD CLAIM OF RELIEF, COUNT 1: By Plaintiffs against Defendants BROWN, TRUSCOTT, SMITH, and DOES 1-100, Inclusive.

**145** Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to be free from the misrepresentation of facts in order to obtain the removal of a child from parents' care, custody, and control. The seizure was **not court ordered**, there was **no [reasonable cause]**, and there was **no exigency**. Reasonable avenues of investigation existed. C.W. was in the cancer ward of a hospital, and he received intensive chemotherapy treatment where he stayed for another twenty-three days without his parents, under guard. The facts in the case of C.W. did not rise to the level of being an emergency. The seizure was unreasonable and egregious. BROWN made substantial contributions to the unreasonable seizure, by distorting, omitting, and misrepresenting facts in her reporting. TRUSCOTT relied on WEISTER's SCAN

team report to justify emergency action. [5]**TRUSCOTT therefore took custody of C.W. in a seizure that was not court order in – JUNE 2014 –** when Defendants singularly and/or jointly acted, agreed, and/or **conspired by acting or failing to act** with a deliberate or reckless disregard of plaintiff's constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent by, but not limited to, **misrepresenting the facts in order to obtain the removal of C.W.** from his parents' care, custody, and control. And each of them, either singularly or jointly acted, and/or conspired, to use omissions, distortions, and misrepresentations in an effort to remove C.W. from his parents. Defendants' deceptive, coercive, unconstitutional conduct caused the unreasonable seizure(s) of C.W. and his continued and prolonged detention from Plaintiff's care, custody, and/or control.  As a result, Plaintiffs' Fourteenth amendment due process rights were violated.

**146** THIRD CLAIM OF RELIEF, COUNT 2: By Plaintiffs against Defendants BROWN, TRUSCOTT, WEISTER, DEOCHOA, DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to be free from the misrepresentation of facts in order to obtain the removal of a child from parents' care, custody, and control.  The seizure was **not court ordered**, there was **no [reasonable cause]**, and there was **no exigency**.  Plaintiffs had a single option and that was to sign a Placement Order.  One business day after it was signed, Plaintiffs revoked the order DEOCHOA coerced Plaintiffs' into signing in – JUNE 2014 and/or JULY 2014 – when they singularly and/or jointly acted, agreed, and/or **conspired by acting or failing to act** with a deliberate or reckless disregard of plaintiff's constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent by, but not limited to, misrepresenting the facts in order to obtain the removal of C.W. from his parents' care, custody, and control.

**147** THIRD CLAIM OF RELIEF, COUNT 3: By Plaintiffs against defendants BROWN, TRUSCOTT, WEISTER, DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to be free from the misrepresentation of facts in order to obtain the removal of a child from parents' care, custody, and control.  The seizure was **not court ordered**, there was **no [reasonable cause]**, and there was **no exigency**.  The purpose of the hold was to support CPS in the ongoing detention of C.W.  CHOW issued a medical hold that was predetermined by BROWN and DOES 1-100 in – JUNE 2014 and/or JULY 2014 -  when they singularly and/or jointly acted, agreed, and/or **conspired by acting or failing to act with a deliberate or reckless disregard of plaintiff's constitutional rights,** and/or the constitutional deprivation occurred at **defendant's direction** or with knowledge or consent by, but not limited to, misrepresenting the facts in order to obtain the removal of C.W. from his parents' care, custody, and control.

**148** THIRD CLAIM OF RELIEF, COUNT 4: By Plaintiffs against Defendants BROWN, TRUSCOTT, DEOCHOA, DOES 1-100, Inclusive.  Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to be free from the misrepresentation of facts in order to obtain the removal of a child from

---

[5] WEISTER'S opinions were based on biased, third party misrepresentations, distortions, and omissions that were provided to her by TRUSCOTT and BROWN. It appears that TRUSCOTT stopped by WEISTER's office after listening in on a forensics expert conduct a stellar interview with C.W. Following that interview, TRUSCOTT gave her distorted take on that interview where C.W. was clear that nothing inappropriate had happened.  WEISTER then used the information provided by BROWN and TRUSCOTT to write her SCAN report which came to the conclusion that abuse had occurred and/or was likely to occur. WEISTER then handed her report to TRUSCOTT, who used the SCAN report as part of her basis to take C.W. into custody in a seizure that was not court ordered. This is a conflict of interest and should not happen in the context of an investigation.

parents' care, custody, and control. The seizure was **not court ordered**, there was **no [reasonable cause]**, and there was **no exigency**. Nurse Aliferakis, who fabricated the original report, impeached herself with her own words [6] in an interview conducted by TRUSCOTT. TRUSCOTT ignored testimony of witnesses and avoided key witnesses, including exculpatory evidence, when she manufactured her own evidence. This was the same day TRUSCOTT became a main speaker in front of hospital staff and CPS Social Workers on speaker phone, and misled everyone present in that meeting. TRUSCOTT detained C.W. a second time without a court order, in – JUNE 2014 and/or JULY 2014 - Defendants singularly and/or jointly acted, agreed, and/or conspired by acting or failing to act with a deliberate or reckless disregard of plaintiff's constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent by, but not limited to, misrepresenting the facts in order to obtain the removal of C.W. from his parents' care, custody, and control.

**149** Each of them, either singularly or jointly acted, and/or conspired, to use omissions, distortions, and misrepresentations in an effort to remove C.W. from his parents. Defendants' deceptive, coercive, unconstitutional conduct caused the unreasonable seizure(s) of C.W. and/or his continued and prolonged detention from Plaintiff's care, custody, and/or control. As a result, Plaintiffs' Fourteenth amendment due process rights were violated.

**150** Defendants, and each of them, maliciously violated and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiff's rights found in the Fourteenth Amendment of the United States Constitution, by, but not limited to, misrepresenting the facts in order to obtain the removal of C.W. from his parents' care, custody and control. Said acts were taken deliberately, with callous or reckless indifference to the substantial rights of Plaintiffs, or fueled by an evil motive or intent.

**151** As a direct and proximate consequence of the misconduct of defendants violating, plaintiff has suffered, and will continue to suffer, damages, including but not limited to, physical and/or mental anxiety and anguish according to proof at trial.

**152** Plaintiffs are therefore entitled to recover punitive damages from defendants, and each of them, as permitted by law and as according to proof at trial, due to the wrongful conduct of defendants as herein alleged.

---

### FOURTH CLAIM FOR RELIEF COUNTS 1, 2, 3, 4, 5, and 6
#### Fourteenth Amendment – Procedural Due Process
*A parent has a liberty interest in familial association and therefore a*
*right to an adequate investigation and a pre-deprivation hearing*
*resulting in a [valid] court order prior to removal, absent exigent circumstances.*

---

[6] When asked if she actually saw C.W.'s buttocks, she responded 'no'.

**153** Plaintiff realleged, and to the extent applicable, incorporates herein as if set forth in full, all paragraphs above, and below.

**154** At all times relevant to this complaint, Defendants were acting under color of state law had a duty to Duty to honor Plaintiffs' Constitutional Rights. Defendants, and each of them, had the affirmative and self-evident duty provide Plaintiffs' with [an adequate] investigation and a pre-deprivation hearing in the juvenile court resulting in a [valid] court order, before C.W. was removed, absent exigent circumstances, -a court with power to adjudicate substantial rights-, including legal and custodial rights of children and parents. The FOURTEENTH Amendment due process clause guarantees that individuals be provided with a [adequate] investigation and pre-deprivation hearing resulting in a [valid] court order before the child is removed from his family unit, absent exigent circumstances.

**155** At all times relevant herein, there existed a clearly established due process right to an [adequate] investigation and a pre-deprivation hearing resulting in a [valid] court order, absent exigent circumstances, before a child is removed. Minimally, [Due Process] [] means that government officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances. Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir.1997) ("Removal of children from the custody of their parents requires pre-deprivation notice and a hearing except for extraordinary situations where some valid governmental interest is at stake that justified postponing the hearing until after the event."); Malik, 191 F.3d at 1315 (a parent has a liberty interest in familial association and privacy that-absent extraordinary circumstances-cannot be violated without adequate pre-deprivation procedures).

**156** A government agent has a duty to intercede when his or her fellow agents violate a person's constitutional rights. Cunningham v. Gates (9th Cir. 2000) 229 F.3d 1271, 1289. A supervisor's action or inaction in the training, supervision, or control of his or her subordinates may be sufficient to show a constitutional violation. (Starr v Baca (9th Cir. 2011) 652 F. 3d 1202, 1208.

**157** The VIOLATION(s) were PROXIMATELY CAUSED by a PERSON UNDER COLOR

**158** FOURTH CLAIM, COUNT 1: By plaintiffs against defendants TRUSCOTT, BROWN, SMITH, and DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to an [adequate] investigation and pre-deprivation hearing [resulting in a court order of removal], absent exigent circumstances. Each of them were acting under color of state law when they singularly and/or jointly acted, agreed, and/or conspired by acting or failing to act with a deliberate or reckless disregard of plaintiff's constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent – in JUNE 2014- by, but not limited to, depriving plaintiffs of their right to an adequate investigation and pre-deprivation hearing, to create a false narrative, which resulted in an unreasonable seizure of C.W. Omissions, distortions, and misrepresentations were used to falsely create a basis, when the investigation was far from adequate. Defendants avoided a pre-deprivation hearing resulting in a [valid] court order of removal, absent exigent circumstances, using this deceptive tactic.

**159** FOURTH CLAIM, COUNT 2: By plaintiffs against defendants BROWN, SMITH, TRUSCOTT, and DEOCHOA and DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to an [adequate] investigation and pre-deprivation hearing [], absent exigent circumstances. Each of them were acting under color of state law when they singularly and/or jointly acted, agreed, and/or conspired by acting or failing to act with a deliberate or reckless disregard of plaintiff's

{FIRST AMENDED COMPLAINT}   **PAGE 37**

constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent – in JUNE 2014- by, but not limited to, depriving plaintiffs of their right to an [adequate] investigation and pre-deprivation hearing, by presenting the unattractive option of a voluntary placement agreement as the only option. C.W. was already in custody. The VPA was revoked one business day later, which resulted in a medical hold issued by the hospital. The unreasonable seizure of C.W. and the omissions, distortions and misrepresentations of TRUSCOTT and BROWN were the instruments CPS used to coerce Plaintiffs' and the moving force in <u>removing C.W. from his family unit without an investigation and pre-deprivation hearing resulting in a [valid] court order of removal, absent exigent circumstances.</u>

**160** FOURTH CLAIM, COUNT 3: By plaintiffs against defendants BROWN, CHOW, TRUSCOTT, SMITH, and WEISTER and DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to an [adequate] investigation and pre-deprivation hearing [], absent exigent circumstances. Each of them were acting under color of state law when they singularly and/or jointly acted, agreed, and/or conspired by acting or failing to act with a deliberate or reckless disregard of plaintiff's constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent – in JUNE 2014 and/or JULY 2014- by, but not limited to, depriving plaintiffs of their right to an [adequate] investigation and pre-deprivation hearing, by issuing an medical hold. C.W. was already in custody. <u>The custody of C.W. was transferred to Seattle Children's Hosptial, and his continued detainment from his family unit was done without an [adequate] investigation and pre-deprivation hearing resulting in a court order of removal,</u> <u>absent exigent circumstances</u>. The continued detainment occured without regard to C.W.'s health and well-being, and was definitely not a decision made by plaintiffs.

**161** FOURTH CLAIM, COUNT 4: By plaintiffs against defendants TRUSCOTT, SMITH, BROWN and DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to an [adequate] investigation and pre-deprivation hearing [], absent exigent circumstances. Each of them were acting under color of state law when they singularly and/or jointly acted, agreed, and/or <u>conspired by acting or failing to act</u> with a deliberate or reckless disregard of plaintiff's constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent – in JUNE 2014 and/or JULY 2014 - by, but not limited to, depriving plaintiffs of their right to an adequate invewasstigation and pre-deprivation hearing, <u>by using omissions, distortions, and misrepresentations to justify police custody without a court order to continue to detain C.W. and keep him from his family unit without an [adequate] investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances.</u>

**162** FOURTH CLAIM, COUNT 5: By plaintiffs against defendants DEOCHOA, TRUSCOTT, SMITH, BROWN, and DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to an [adequate] investigation and pre-deprivation hearing resulting in a [valid] court order, prior to removal, absent exigent circumstances. Each of them were acting under color of state law when they singularly and/or jointly acted, agreed, and/or <u>conspired by acting or failing to act</u> with a deliberate or reckless disregard of plaintiff's constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent – in JULY 2014- by, but not limited to, using the omissions distortions, and misrepresentations of BROWN and TRUSCOTT to deprive plaintiffs of their right to an [adequate] investigation and pre-deprivation hearing, by <u>removing C.W.</u> from his family unit <u>without</u>

an [adequate] investigation and pre-deprivation hearing resulting in a [valid] court order of removal, absent exigent circumstances. C.W. was already in the hospital. The unreasonable seizure (s) of C.W. and the omissions, distortions and misrepresentations of TRUSCOTT and BROWN were the instruments CPS used to coerce Plaintiffs'.

**163** FOURTH CLAIM, COUNT 6: By plaintiffs against defendants DEOCHOA, TRUSCOTT, JANSEN, BROWN, WEISTER, and DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to an [adequate] investigation and pre-deprivation hearing resulting in a [valid] court order, prior to removal, absent exigent circumstances. Each of them were acting under color of state law when they singularly and/or jointly acted, agreed, and/or conspired by acting or failing to act with a deliberate or reckless disregard of plaintiff's constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent by, but not limited to, depriving plaintiffs of their right to an [adequate] investigation and pre-deprivation hearing, by removing C.W. – in JANUARY 2016- from his family unit without an [adequate] investigation, absent a pre-deprivation hearing resulting in a [valid] court order of removal, and absent exigent circumstances. The court order was issued unwittingly by the commissioner who was misled by the omissions, distortions, and misrepresentations of BROWN, TRUSCOTT, WEISTER, JANSEN, and DEOCHOA. Avenues of investigations existed that would have been easily available to DEOCHOA.

**164** Defendants' deceptive, coercive and unconstitutional conduct caused an unreasonable seizure of C.W. and/or his continued and prolonged detention from Plaintiff's care, custody, and/or control. Defendants conduct similarly caused the violation of Plaintiffs' Fourteenth Amendment Due Process rights.

**165** Defendants, and each of them, maliciously violated and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiff's rights found in the Fourteenth Amendment of the United States Constitution, by, but not limited to, removing C.W. from his family unit without an [adequate] investigation and a pre-deprivation hearing resulting in a [valid] court order prior to removal of C.W., absent exigent circumstances. Said acts were taken deliberately, with callous or reckless indifference to the substantial rights of Plaintiffs, or fueled by an evil motive or intent.

**166** As a direct and proximate consequence of the misconduct of defendants violating, plaintiff has suffered, and will continue to suffer, damages, including but not limited to, physical and/or mental anxiety and anguish according to proof at trial.

**167** Plaintiffs are therefore entitled to recover punitive damages from defendants, and each of them, as permitted by law and as according to proof at trial, due to the wrongful conduct of defendants as herein alleged.

---

*FIFTH CLAIM FOR RELIEF Count 1 and 2 Fourteenth Amendment – Procedural Due Process*
*A parent has a liberty interest in familial association and therefore a right to*
*Notice and a hearing before a child is removed 'except for extraordinary circumstances'*
*(including 'emergency circumstances' which pose an immediate threat to the safety of a child.)*

---

**168** Plaintiff realleged, and to the extent applicable, incorporates herein as if set forth in full, all paragraphs above, and below.

**169** At all times relevant to this complaint, Defendants were acting under color of state law and had a duty to honor Plaintiffs' Constitutional Rights. Defendants, and each of them, had the affirmative duty, guaranteed by the Due Process Clause of the Fourteenth amendment, to provide Plaintiffs with notice and a hearing in the Juvenile Court, before their child, C.W. was removed from their care, 'except for extraordinary circumstances' (including 'emergency circumstances' which pose an immediate threat to the safety of a child.) – a court with power to adjudicate substantial rights, including legal and custodial rights of children and parents.

**170** At all times relevant herein, there existed a clearly established due process right of individuals to notice and a hearing before a child is removed "'<u>except for extraordinary situations where some valid governmental interest is at stake</u> that justifies postponing the hearing until after the event.'" Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir.1989) (quoting Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 848, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977)) Parental rights cannot be denied without an "opportunity for them to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), "<u>Valid governmental interests</u>" include "<u>emergency circumstances which pose an immediate threat to the safety of a child</u>." Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir.1997).

**171** As cited in Roska v. Peterson in the 10th Circuit Court of Appeals (2002), it was clearly established in May 1999 that <u>the Constitution prohibits</u> warrantless, no-knock entries, warrantless seizures, and removal of a child from the home without following proper procedures. (Special Needs Searches) <u>Searches conducted without a warrant are per se UNREASONABLE under the Fourth Amendment-subject only to a few "specifically established and well-delineated exceptions."</u> Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576, (1967) (footnotes omitted).

**172** This insistence upon interposing a "neutral and detached magistrate" between the state and the citizenry, subject to a few exceptions justified only by "exceptional circumstances," Johnson v. United States, 333 U.S. 10, 13-14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), has become a "cardinal principle" of Fourth Amendment jurisprudence. Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

**173** This statute (U.S.C. §1983) is designed to protect individuals from an abuse of state power by providing a cause of action against state and local officials, and those who conspire with them, who, acting within the scope of their duties, have deprived an individual of a <u>cognizable</u> federal right. *See Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). As the Second Circuit has noted, the "mere possibility" of danger is not enough to justify a removal without appropriate process. Tenenbaum v. Williams, 193 F.3d 581, 594 (2d Cir.1999). The Fourteenth Amendment does not protect against all deprivations of liberty, "only against deprivations of liberty accomplished `<u>without due process of law</u>.'" *Baker,* 443 U.S. at 145, 99 S.Ct. at 2695, see also Kelson v. Springfield 767 F 2d 561; US Ct. App 9th Cir, 1985.

**174** The VIOLATION(s) were PROXIMATELY CAUSED by a PERSON UNDER COLOR

**175** FIFTH CLAIM, COUNT 1: By plaintiffs against defendants TRUSCOTT, SMITH, BROWN, and DEOCHOA, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right

to notice and a hearing before a child is removed 'except for extraordinary circumstances' (including 'emergency circumstances' which pose an immediate threat to the safety of a child.) Defendants were acting under color of state law when -in JUNE 2014 and/or JULY 2014- they singularly and/or jointly acted, agreed, and/or <u>conspired by acting or failing to act</u> with a deliberate or reckless disregard of plaintiff's constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent by, but not limited to, depriving plaintiffs of their right to Notice and a hearing before a child is removed 'except for extraordinary circumstances' (<u>including 'emergency circumstances' which pose an immediate threat to the safety of a child.</u>)

**176** FIFTH CLAIM, COUNT 2: By plaintiffs against defendants DEOCHOA, JANSEN, TRUSCOTT, WEISTER, BROWN, DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to notice and a hearing before a child is removed '<u>except for extraordinary circumstances</u>' (including 'emergency circumstances' which pose an immediate threat to the safety of a child.) Each of them were acting under color of state law when they singularly and/or jointly acted, agreed, and/or <u>conspired by acting or failing to act</u> with a deliberate or reckless disregard of plaintiff's constitutional rights, and/or the constitutional deprivation occurred at defendant's direction or with knowledge or consent by, but not limited to, depriving plaintiffs of their right to notice and a hearing before  C.W. was removed from their care– in JANUARY 2016 - <u>there were NO extraordinary circumstances' which might have excused defendants pre-deprivation conduct</u>.

**177** Each of them, either singularly or jointly acted, and/or conspired, to seize C.W. without providing notice and an opportunity to be heard, where defendants knew that there was no emergency posing an immediate threat to the safety of C.W. Defendants' deceptive conduct caused an unreasonable seizure of C.W. and his continued and prolonged detention from Plaintiff's care, custody, and/or control. This conduct caused the violation of Plaintiffs' Fourteenth Amendment Due Process rights.

**178** Defendants, and each of them, maliciously violated and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiff's rights found in the Fourteenth Amendment of the United States Constitution, by, but not limited to, depriving plaintiffs of their right to Notice and a hearing before child is removed 'except for extraordinary circumstances' (including 'emergency circumstances' which pose an immediate threat to the safety of a child.  Said acts were taken deliberately, with callous or reckless indifference to the substantial rights of Plaintiffs, or fueled by an evil motive or intent.

**179** As a direct and proximate consequence of the misconduct of defendants violating, plaintiff has suffered, and will continue to suffer, damages, including but not limited to, physical and/or mental anxiety and anguish according to proof at trial.

**180** Plaintiffs are therefore entitled to recover punitive damages from defendants, and each of them, as permitted by law and as according to proof at trial, due to the wrongful conduct of defendants as herein alleged.

***SIXTH CLAIM FOR RELIEF COUNTS 1 and 2***
***Fourteenth Amendment – Procedural Due Process***
***A parent has a liberty interest in familial association and therefore a right to a prompt and***
***adequate post-deprivation Judicial review, in a child custody case to ratify emergency action.***

**181** Plaintiff realleged, and to the extent applicable, incorporates herein as if set forth in full, all paragraphs above, and below.

**182** At all times relevant to this complaint, Defendants were acting under color of state law and had a duty to honor Plaintiffs' Constitutional Rights. Defendants, and each of them, had the affirmative and self-evident duty to promptly provide an adequate post-deprivation judicial review to ratify emergency action in the juvenile court – a court with power to adjudicate substantial rights, including legal and custodial rights of children and parents.  The FOURTEENTH Amendment due process clause guarantees that individuals be provided a prompt and adequate judicial review to ratify emergency action.

**183** At all times relevant herein, there existed a clearly established due process right of individuals to a prompt and adequate post deprivation review to ratify emergency action. Perhaps the facts as developed on remand will demonstrate that a pre-deprivation hearing was not constitutionally required because emergency action was required to avert imminent harm to [C.W].  Donald v. Polk County, 836 F.2d 376, 380 (7th Cir.1988) ("In an emergency situation the government may take away liberty with post-deprivation hearing."). Nevertheless, "the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed." Weller, 901 F.2d at 393 (internal quotations omitted). Thus, due process guarantees that the post-deprivation judicial review of a child's removal be prompt and fair.   See, e.g., Campbell v. Burt, 141 F.3d 927, 929 (9th Cir.1998) (procedural due process guarantees prompt and adequate post-deprivation judicial review in child custody case); Jordan by Jordan, 15 F.3d at 343. It is well settled; the requirements of process may be delayed where emergency action is necessary to avert imminent harm to a child provided that adequate post-deprivation process to RATIFY THE EMERGENCY action is promptly accorded.").

**184** SIXTH CLAIM OF RELIEF, COUNT 1: By plaintiffs against defendants POTTS, and DOES 1-100, Inclusive. Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to a prompt and adequate post-deprivation judicial review in a child custody case to ratify the emergency action. Each of them were acting under color of state law when they singularly and/or jointly acted, agreed, and/or conspired by acting or failing to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or the constitutional deprivation occurred at defendant's direction or with knowledge or consent, – in JANUARY 2016 through JUNE 2016 - by, but not limited to, using deceptive and coercive means to deprive Plaintiffs' of their constitutional rights, thereby failing to provide Plaintiffs with a prompt and adequate post-deprivation judicial review in a child custody case to RATIFY THE EMERGENCY action.

**185** This unconstitutional conduct caused the unreasonable continued and prolonged detention of C.W. from Plaintiff's care, custody, and/or control and violated Plaintiffs' Fourteenth Amendment due process rights.

**186** Defendants, and each of them, maliciously violated and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiff's rights found in the Fourteenth Amendment of the United States Constitution, by, but not limited to, depriving plaintiffs of their right to a prompt and adequate post-deprivation judicial review to ratify emergency action. Said acts were taken deliberately, with callous or reckless indifference to the substantial rights of Plaintiffs, or <u>fueled by an evil motive or intent.</u>

**187** As a direct and proximate consequence of this violation, Plaintiff has suffered, and will continue to suffer, damages, including but not limited to, physical and/or mental anxiety and anguish according to proof at trial.

**188** Defendants acted intentionally and/or with a conscious disregard for Plaintiffs' constitutional rights. As a result of this conduct, Plaintiffs are entitled to recover punitive damages against these individual

---

### SEVENTH CLAIM FOR RELIEF; COUNT 1

*Fourteenth Amendment – Procedural Due Process and/or the First Amendment. A parent has a liberty interest in familial association and therefore a right to be free from the deliberate suppression of evidence that would have impeached and refuted the testimony given against him/her. In addition, a parent has a right not to be framed under the due process clause of the 14th amendment, a right to freedom of speech, a right not to be coerced, and a right to [not] petition the government for the redress of grievances under the 1st Amendment.*

---

defendants.

**189** Plaintiff realleged, and to the extent applicable, incorporates herein as if set forth in full, all paragraphs above, and below.

**190** At all times relevant to this complaint, Defendants were acting under color of state law and had a duty to honor Plaintiffs' Constitutional Rights. Defendants, and each of them, had the affirmative and self-evident duty to provide the juvenile court with materially exculpatory evidence – a court with power to adjudicate substantial rights, including legal and custodial rights of children and parents. Similarly, defendants had an equal DUTY TO REFRAIN from <u>deliberately suppressing evidence that would have impeached and refuted the testimony given against [Plaintiffs] whose rights were being violated</u>. The Fourteenth Amendment due process clause guarantees that individuals be from the deliberate suppression of evidence that would have impeached and refuted the testimony given against him/her.

**191** At all times relevant herein, there existed a clearly established due process right of individuals to be free of the deliberate suppression of evidence that would have impeached and refuted the testimony given against him. *See Pyle,* 317 U.S. at 216, 63 S.Ct. at 178; *Mooney,* 294 U.S. at 110, 55 S.Ct. at 341. The Third Circuit in the Baldi case construed that statement in Pyle v. Kansas to mean that the 'suppression of evidence

favorable' to the accused was itself sufficient to amount to a denial of due process. 195 F.2d, at 820. In Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217. Omission of information that implicates a witness'credibility is material.  United States v. Reeves (9th Cir, 2000) 210 F.3d 1041, 1045; Bettin v. Maricopa County (d. Ariz. 2007) 2007 U.S. Distr LEXIS 42979, *46; United States v. Hill (N.D. Cal. 2014) 2014 U.S.*24.

**192** A government agent has a duty to intercede when his or her fellow agents violate a person's constitutional rights. Cunningham v. Gates (9th Cir. 2000) 229 F.3d 1271, 1289.  A supervisor's action or inaction in the training, supervision, or control of his or her subordinates may be sufficient to show a constitutional violation. (Starr v Baca (9th Cir. 2011) 652 F. 3d 1202, 1208.

**193** The VIOLATION(s) were PROXIMATELY CAUSED by a PERSON UNDER COLOR

**194** SEVENTH CLAIM OF RELIEF, COUNT 1: By Plaintiffs against the following defendants acting under color of state law; LUND, GOURLEY, and DOES 1-100, Inclusive.  Plaintiffs are informed and thereon allege that defendants violated Plaintiffs' right to be free of the deliberate suppression of evidence that would have impeached and refuted the testimony given against them. Each of them were acting under color of state law when they singularly and/or jointly acted, agreed, and/or conspired by acting or failing to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or the constitutional deprivation occurred at defendant's direction or with knowledge or consent, – in MARCH 2016 through JUNE 2016 - by, but not limited to, deliberately suppressing evidence that would have impeached and refuted the testimony given against Plaintiffs. Instead, Defendants, and each of them demanded that Plaintiffs' secure a protection order in order to regain custody of their son, knowing that no evidence existed that would justify a protection order against John. Defendants used the requirement for a protection order as a means to coerce Plaintiffs into doing something that they would not have otherwise been legally obligated to do, and would not have done. Defendants ulterior purpose or motive underlying the abuse of process was to coerce Plaintiffs into providing evidence in the form of a protection order sought by plaintiffs against John Hudspeth. The requirement for a protection order was not proper and defendants knew that exculpatory evidence existed, yet made the deliberate decision not to disclose. Defendants knew that there was a lack of probable cause. The protection order was ultimately terminated by a Superior Court Judge in favor of Plaintiffs. This unconstitutional conduct by defendants caused the unreasonable continued detention and prolonged detention of C.W. from Plaintiff's care, custody, and/or control.

**195** Each of them, had the affirmative and self-evident provide the juvenile court with materially relevant exculpatory evidence, a court with power to adjudicate substantial rights, including legal and custodial rights of children and parents.  Defendants conduct influenced the Juvenile Court, impairing, and/or impinging upon Plaintiff's post-deprivation due process rights.

**196** Defendants, and each of them, maliciously violated and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiff's rights found in the Fourteenth Amendment of the United States Constitution, by, but not limited to, suppression of exculpatory evidence that would have impeached and refuted the testimony that was given against them. Said acts were taken deliberately, with callous or reckless indifference to the substantial rights of Plaintiffs, or fueled by an evil motive or intent.

**197** As a direct and proximate consequence of this violation, Plaintiff has suffered, and will continue to suffer, damages, including but not limited to, physical and/or mental anxiety and anguish according to proof at trial.

**198** Defendants acted intentionally and/or with a conscious disregard for Plaintiffs' constitutional rights. As a result of this conduct, Plaintiffs are entitled to recover punitive damages against these individual defendants.

### EIGHTH CLAIM FOR RELIEF
### 42 U.S.C §1985 Claim
### Violation of U.S.C. §1985 by Plaintiff against DEFENDANTS, Inclusive.

**199** Plaintiffs reallege, and to the extent applicable, incorporates by reference, all paragraphs above, and below.

**200** A government agent has a duty to intercede when his or her fellow agents violate a person's constitutional rights. Cunningham v. Gates (9th Cir. 2000) 229 F.3d 1271, 1289. A supervisor's action or inaction in the training, supervision, or control of his or her subordinates may be sufficient to show a constitutional violation. (Starr v Baca (9th Cir. 2011) 652 F. 3d 1202, 1208.

**201** DEFENDANTS, inclusive, conspired to and did, remove the minor C.W. from PLAINTIFF's care, without notice or a full hearing. Further, DEFENDANTS and, inclusive, conspired to use and did use unconstitutional tactics including but not limited to trickery, duress and/or presentation of fabrication of evidence, false or distorted statements, and suppression of exculpatory evidence, in preparing and/or presenting reports and documents to the Court. These actions interfered with Plaintiff's rights, including those under the United States Constitution.

**202** Defendants, and each of them, engaged in said conspiracies for the purpose of depriving PLAINTIFF of equal protection of the laws of the United States. And each of them took several acts in furtherance of the conspiracy, including but not limited to: unlawfully removing and detaining minor C.W. from the care of his mother and father, without a valid court order, consent, or exigent circumstances (imminant danger was undermined by misrepresentation of fact, and a failure to investigate); denied Plaintiffs their right to notice and an opportunity to be heard prior to said detention, continuing to detain C.W. for an unreasonable period after any alleged basis for removal; denied PLAINTIFFS their right to notice and an opportunity to be heard in a reasonable time after the detention; continued to detain minor Plaintiff C.W. for an unreasonable period after receiving material information from a key witness; In addition, DEFENDANTS, and each of the, conspired to use trickery, duress, presentation of fabricated and/or false evidence, misrepresentations of fact,  and failure to disclose exculpatory evidence to the Court. The conduct of DEFENDANTS and each of them, interfered with Plaintiffs' rights, including the right to familial association free from government interference as guaranteed by the Fourteenth Amendment of the Constitution of the United States.

**203** Plaintiffs Rachelle and Duane did, in fact, suffer the deprivation of numerous rights granted to citizens of the United States, including those under the Due Process Clause of the Fourteenth Amendment, which has been interpreted to protect the fundamental liberty interest in familial relations.

**204** DEFENDANTS, and each of them, acted with malice and with the intent to cause injury to Plaintiffs or acted with a willful and conscious disregard of the rights of Plaintiffs in a despicable, vile, and contemptible manner. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said Defendants and to deter them and others from such conduct in the future.

## NINTH CLAIM NINTH CLAIM FOR RELIEF – MONELL RELATED CLAIMS FOR UNWARRANTED SEIZURES BY BENTON COUNTY
### (By Plaintiff Against BENTON COUNTY COMMUNITY PROTECTION TEAM DEFENDANTS, and POTTS, LUND, DEOCHOA, GOURLEY, WEISTER and DOES 1-100)

**1** Plaintiff realleges, and to the extent applicable, incorporates herein as if set forth in full, all paragraphs above, and below.

**205** *Monell v. Department of Social Services*, 436 U.S. 658 (1978), is an opinion given by the United States Supreme Court in which the Court overruled *Monroe v. Pape* in holding that a local government is a "person" subject to suit under Section §1983 of Title 42 of the United States Code: *Civil action for deprivation of rights*. Additionally, the Court held that §1983 claims against municipal entities must be based on implementation of a policy or custom. The United States Supreme Court held that a local government is a "person" that can be sued under Section §1983 of Title 42 of the United States Code: civil action for deprivation of rights. The Court, however, required that a §1983 claim against a municipal entity be based on the implementation or execution of a "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that party's officers". Additionally, the Court held that municipal entities "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels". There is no immunity for municipalities/entities targeted by Monell claims. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 166-167 (1993); Joyce v Town of Tewksbury, 112 F.3d 19, 23 (1st Cir. 1997); Kirkpatrick v. Cnty. Of Washoe 843 F3d 784, 793 (9th Cir, 2016). While no specific formula for defining State action exists, courts have traditionally evaluated whether a private actor has engaged in state action by relying on four distinct – but not mutually exclusive – tests: (1) the governmental nexus test, (2) the joint action test, (3) the public function test, and (4) the state compulsion test. [7] A private hospital acts "under color" of state law when it expressly contracts with the government to provide medical services. [8] Likewise, contract services provided by "licensed private physicians" to municipal governments in the examination of person brought to treatment facilities by government officials constitutes state action within the meaning of Section 1983. [9] Just as in United States v. Wiseman, *supra*, 445 F.2d at 796, Sugarman v Perez 2nd circuit (1974) "directly involves defendants' mode of conducting the

---

[7] Howereton, supra, 708 F.2d 380 at 382-282.
[8] Lopez v. Dep't of Health Services, 939 F.2d 991, 883 (9th Cir. 1991)

[9] Jensen v. Land County, 222 F.3d 570, 575 (9th Cir. 2000); Elam v. Hernandez, 2011 U.S. Dist. LEXIS 77104, "10-11 (C.D. Cal. 2011).

public function and does not involve a collateral aspect of" the business of operating an institution which cares for children. The existence of this nexus has made the courts more receptive to a finding of "state action." See, e. g., id. at 796. Bystanders are not immune from suit. A government agent has a duty to intercede when his or her fellow agents violate a person's constitutional rights. Cunningham v. Gates (9th Cir. 2000) 229 F.3d 1271, 1289. A supervisor's action or inaction in the training, supervision, or control of his or her subordinates may be sufficient to show a constitutional violation. (Starr v Baca (9th Cir. 2011) 652 F. 3d 1202, 1208.)

**206** Monell applies to suits against private entities under § 1983. Tsao v. Desert Palace Inc.,698 F.3d 1128, 113801139 (9th Cir. 2012). [10]

**2** Plaintiffs bring this action on their own behalf to recover damages arising from **BENTON COUNTY PROTECTION TEAM DEFENDANTS** and DOES 1-100 violation of Plaintiffs' right to continued care, custody, and control of C.W. arising under the First and Fourteenth Amendments to the United States Constitution. Plaintiff does not bring this action on behalf of C.W., or to recover any damages for constitutional injuries inflicted on C.W., whose rights arising under the Fourth Amendment to the United States Constitution are not implicated in this action.

**3** **BENTON COUNTY PROTECTION TEAM DEFENDANTS** and DOES 1-100 had a duty to implement and follow policies, procedures, customs and/or practices which confirm and provide the protections guaranteed under the United States Constitution. **BENTON COUNTY PROTECTION TEAM DEFENDANTS** and DOES 1-100 had a duty to use reasonable care to train, supervise, and/or control its agents, so as to protect these constitutional rights.

**4** Based on the duties charged to law enforcement officers and state social workers under State and Federal laws, and, including the powers to seize children from their parents' custody, **BENTON COUNTY PROTECTION TEAM DEFENDANTS** and DOES 1-100 knew or should have known of the need to establish the customs, policies, and/or procedures required to protect the civil rights of parents and children with whom their agents regularly came into contact, and of the need to adequately train its law enforcement officers and Children's Administration Social Workers. At the time of the underlying events, the **BENTON COUNTY PROTECTION TEAM DEFENDANTS** and DOES 1-100 actions relating to the removal of a child from its parent's custody included, but were not limited to: A. The custom of removing a child from his parents' custody without first conducting a reasonably adequate investigation and providing a pre-deprivation hearing resulting in a court order, absent exigent circumstances.

---

[10] "As the district court correctly found, insofar as the Hospital was acting in the latter capacity – as part of the reporting and enforcement machinery for CWA, a government agency charged with detection and prevention of child abuse and neglect – the Hospital was a state actor." "[C]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action . . . In certain instances the actions of private entities may be considered to be infused with state action' if those private parties are performing a function public or governmental in nature and which would have to be performed by the Government but for the activities of the private parties. Perez v. Sugarman, 499 F2d 761, 764-65 (2d Cir. 1974)(quoting Evans v. Newton, 382 U.S. 296, 299 (1966)" Mora P. v. Rosemary McIntyre, (Case No.: 98-9595) 2nd Cir (1999).

B. The custom of removing a child from his parents' care, custody, and control, without providing notice and an opportunity to be heard prior to the removal, absent exigent circumstances (i.e., imminent danger of serious bodily injury).

C. The custom of continuing to detain a child from his parents' custody without providing prompt and adequate judicial review to ratify emergency action in a child custody case.

D. The custom of suppressing exculpatory evidence that would refute the testimony given against the accused.

E. The custom of seizing children from his or her parent's custody by misrepresenting the facts in order to obtain a court order, without a true exigency, based on a hope that further investigation could turn up facts suggesting the seizure was justified.

F. The custom to not intercede in and/or prevent the removal of a child from his or her parent's custody when the court order was based on misrepresentations of evidence, without a true exigency.

G. The custom of holding a child ransom in exchange for successfully putting a protection order into place, even when the facts do not support additional need for protection.

**5** DEOCHOA and LUND were acting pursuant to and in accordance with **BENTON COUNTY PROTECTION TEAM DEFENDANTS** and DOES 1-100 child removal customs.

**6** **BENTON COUNTY PROTECTION TEAM DEFENDANTS** and DOES 1-100 ratified and/or approved of C.W.'s unreasonable seizure.

**7** **BENTON COUNTY PROTECTION TEAM DEFENDANTS** and DOES 1-100 failed to train its government officials on the constitutional rights of a parent and child, including but not limited to:

A. That a government official cannot obtain a court order to remove a child from his parents' custody by omitting. misrepresenting and distorting events, based on the hope that parents will be coerced into providing support for government officials' unconstitutional actions.

B. That a government official cannot remove a child from their parents' custody without first performing a reasonably adequate investigation.

C. That parents must be provided with an opportunity to be heard at a meaningful time in a meaningful manner, and required prior to removing a child from his parents, absent exigent circumstances.

D. The fact that parents have a right to notice and a hearing, resulting in a [valid] court order to the remove the child, absent exigent circumstances.

E. The fact that when used without sufficient <u>REASON</u> and/or with questionable empirical support, coercive interventions may lead to harmful and/or unjust consequences for the parent and child.

F.  The fact that parents have a right to a prompt and adequate post-deprivation judicial review to ratify the action, in a child custody case if exigent circumstances, in fact, existed.

G.  That suppression of exculpatory evidence that would refute the testimony given against the accused, is a violation of a persons' constitutional rights.

H.  The fact that misrepresenting the facts in order to obtain a court order violates parental rights. BENTON County's failure to train its law enforcement offices and/or DSHS, DCYF, DCFS, CA, CPS, CWS, Social Workers on these established constitutional rights was a substantial factor in causing Plaintiffs' harm. Without adequate training, DETECTIVE JANSEN, SOCIAL WORKER

DEOCHOA and SOCIAL WORKER LUND, infringed upon Plaintiffs' First and Fourteenth Amendment Rights.

**8** **BENTON COUNTY PROTECTION TEAM DEFENDANTS** and DOES 1-100, inclusive, failure to train is agents and/or agents on these established constitutional rights was a substantial factor in causing Plaintiffs' harm. Without adequate training, DEOCHOA, LUND and DOES 1-100 were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they seized C.W. without consent, court order, and/or exigency.

**9** These actions, and/or inactions, of **BENTON COUNTY PROTECTION TEAM DEFENDANTS** and DOES 1-100, were the moving force behind the plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, in an amount to be proven at trial.

**10** (This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiff may seek leave to amend this pleading as more information becomes available.)

---

### MONELL RELATED CLAIMS FOR UNWARRANTED SEIZURE and on-going detention leading to the VIOLATION OF FOURTEENTH AMENDMENT RIGHT of FAMILY ASSOCIATION
#### (By Plaintiff Rachelle and Duane Ward Against KING COUNTY COMMUNITY PROTECTION TEAM, and Defendants TRUSCOTT, BROWN, WEISTER, SMITH, DEOCHOA, CHOW, DOES 1-100)

**11** Plaintiff realleges each of the preceding paragraphs, and to the extent applicable, incorporates each of them herein as if set forth in full.

**12** Plaintiff brings this action on her own behalf to recover damages arising from *KING COUNTY COMMUNITY PROTECTION TEAM* and DOES 1-100 violation of Plaintiffs' right to continued care, custody, and control of C.W. arising under the First and Fourteenth Amendments to the United States Constitution. Plaintiff does not bring this action on behalf of C.W., or to recover any damages for constitutional injuries inflicted on C.W., whose rights arising under the Fourth Amendment to the United States Constitution are not implicated in this action.

**13** *KING COUNTY COMMUNITY PROTECTION TEAM* and DOES 1-100, are "persons" within the meaning of 42 U.S.C. §1983 and subject to *Monell* liability. *Monell v. Dept. of Social Services* (1978) 436 U.S. 658.

**14** Monell applies to suits against private entities under § 1983. Tsao v. Desert Palace Inc.,698 F.3d 1128, 113801139 (9th Cir. 2012). [11]

**15** *KING COUNTY COMMUNITY PROTECTION TEAM* and DOES 1-100, and each of them, acted under color of state law when committing the acts alleged herein, in violation of Plaintiff's rights.

**16** *KING COUNTY COMMUNITY PROTECTION TEAM* and DOES 1-100, and those individuals in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiff to establish, implement and follow policies, procedures, customs and/or practices which confirm and provide the protections guaranteed Plaintiff under the United States Constitution, including those under the First and Fourteenth Amendments. This includes, without limitation, the protection of the right to familial relations; the right to privacy; and the rights to substantive and procedural due process.

**17** *KING COUNTY COMMUNITY PROTECTION TEAM* and DOES 1-100 also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, so as to protect these constitutional rights; and to refrain from acting in action with deliberate indifference to the constitutional rights of Plaintiff in order to avoid causing the injuries and damages alleged herein. Moreover, based on the duties charged to the *KING COUNTY COMMUNITY PROTECTION TEAM*, including the powers to seize children from their parents' care, *KING COUNTY COMMUNITY PROTECTION TEAM* and DOES 1-100 and policymaking officials knew or should have known of the need to establish customs, policies, and/or practices required to protect the aforementioned civil rights of parents and their children with whom their agents regularly came into contact – and to adequately train and supervise its employees, representatives, and/or actors on constitutionally appropriate policies and practices.

**18** *KING COUNTY COMMUNITY PROTECTION TEAM* and DOES 1-100 established, adopted, followed, implemented, and/or turned a blind eye to policies, procedures, customs and/or practices carried out by BROWN, TRUSCOTT, SMITH, CHOW, DEOCHOA, AND DOES 1-100, when they violated Plaintiff's constitutional rights by seizing C.W. from Plaintiff's care and custody without first obtaining a court order where C.W. was in no danger of suffering severe bodily injury or death. In addition, *KING COUNTY COMMUNITY PROTECTION TEAM* and DOES 1-100 established, adopted, followed, implemented and/or turned a blind eye to policies, procedures, customs and/or practices which were followed, complied with, and carried out by BROWN, TRUSCOTT, SMITH, CHOW, DEOCHOA, and DOES 1-100. When it was known that there was no basis to do so, they violated Plaintiff's constitutional rights by continuing to detain C.W. from Plaintiff's custody. At the time of the underlying events, the regularly established customs the Protection Team that were followed, adhered to, complied with, and carried out by BROWN, TRUSCOTT, SMITH, CHOW, DEOCHOA,

---

[11] "As the district court correctly found, insofar as the Hospital was acting in the latter capacity – as part of the reporting and enforcement machinery for CWA, a government agency charged with detection and prevention of child abuse and neglect – the Hospital was a state actor." "[C]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action . . . In certain instances the actions of private entities may be considered to be infused with state action' if those private parties are performing a function public or governmental in nature and which would have to be performed by the Government but for the activities of the private parties. Perez v. Sugarman, 499 F2d 761, 764-65 (2d Cir. 1974)(quoting Evans v. Newton, 382 U.S. 296, 299 (1966)" Mora P. v. Rosemary McIntyre, (Case No.: 98-9595) 2nd Cir (1999).

and DOES 1-100, and each of them, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiff's constitutional rights include, but not limited to:

a. The policy, custom, or practice of detaining children from the custody of their parents in the absence of exigent circumstances (immediate danger of serious bodily injury), without first obtaining a court order.

b. The policy, custom, or practice of removing children from their family without first performing a reasonable investigation into allegations of abuse, or investigating only after the unwarranted seizure is *fait accompli*.

c. The policy, custom, or practice of removing children from their parent's custody absent exigent circumstances, without a court order, based on a hope that further investigation could turn up facts suggesting the seizure was justified.

d. The policy, custom, or practice of removing children from their parent's custody absent exigent circumstances, without a court order, based purely on speculation that harm might occur at some point in the future.

e. The policy, custom, or practice of seizing a child from the custody of its parents – without judicial authorization after having allowed the child to remain in his or her parents' care for days, after any purported danger was first brought to the attention of ***KING COUNTY COMMUNITY PROTECTION TEAM*** and DOES 1-100.

f. The policy, custom, or practice of removing a child from the custody of its parent(s) – without judicial authorization - while the child was a patient at a hospital or other similar medical facility.

g. The policy, custom, or practice of making a predetermination to issue a "Medical Hold" if a VPA is revoked by parents, without informing parents of the consequences of signing and revoking the agreement.

**19** (This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiff may seek leave to amend this pleading as more information becomes available.)

**20** These actions, and/or inactions, of ***KING COUNTY COMMUNITY PROTECTION TEAM*** and DOES 1-100 were the moving force behind, and direct and proximate cause of Plaintiff's injuries. As a result, Plaintiff has sustained general and special damages, to an extent and in an amount to be proven at trial.

PRAYER

WHEREFORE, Plaintiff prays for judgement against DEFENDANTS as follows:

1. Plaintiffs demand a jury trial as to the issues so triable;
2. General damages and special damages according to proof, but in no event less than $2,000,000;
3. Punitive damages as allowed by law, against the individual defendants only and not against any municipal defendant;
4. Attorneys fees pursuant to 42 U.S.C. §1988, and any other appropriate statute;
5. Injunctive relief, both preliminary and permanent, as allowed by law;
6. Costs of suit incurred herein;
7. Such further relief as allowed by law; and
8. Such further relief as the Court deems just and proper.

Dated: April 18, 2019 _____ Duane Ward

Duane Ward and Rachelle Ward, Plaintiffs

{FIRST AMENDED COMPLAINT}  **PAGE 51**